**11-4406(L), 11-4407(CON), 11-4408(CON)**

# United States Court of Appeals
# for the Third Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL PROTECTION;
STATE OF NEW YORK; STATE OF NEW JERSEY,

*Intervenors-Plaintiffs-Appellants,*

v.

EME HOMER CITY GENERATION, L.P., et al.

*Defendants-Appellees.*

On Appeal from the United States District Court for
the Western District of Pennsylvania (McVerry, U.S.D.J.)

## BRIEF FOR STATES OF NEW YORK AND NEW JERSEY, and COMMONWEWALTH OF PENNSYLVANIA, DEPARTMENT OF ENVIRONMENTAL PROTECTION

BARBARA D. UNDERWOOD
 *Solicitor General*
RICHARD DEARING
 *Deputy Solicitor General*
CLAUDE S. PLATTON
 *Assistant Solicitor General*
MICHAEL J. MYERS
 *Assistant Attorney General*
 *of Counsel*

ERIC T. SCHNEIDERMAN
 *Attorney General of the*
 *State of New York*
Attorney for State of New York
120 Broadway
New York, New York 10271
(212) 416-6511

Dated: November 14, 2012

*(counsel listing continues on signature pages)*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF ISSUES ......................................................................... 2

STATEMENT OF THE CASE .................................................................... 4

STATEMENT OF FACTS ........................................................................... 7

    A.   The Clean Air Act Aims To Limit Air Pollution From
        Newly Constructed or Modified Power Plants ........................ 7

        1.   The PSD Program Prevents Degradation of Air
              Quality by Regulating Emissions from New and
              Modified Sources of Air Pollution ................................... 10

        2.   The Title V Program Collects All Applicable
              Conditions of a Plant's Ongoing Operation,
              Including Emissions Limitations, in a Single
              Permit ............................................................................... 16

    B.   The Homer City Plant Was Significantly Modified in
        the Early and Mid 1990s, Yet Has Never Complied
        With the Clean Air Act's Emissions Limitations .................. 18

    C.   The District Court's Dismissal of the Complaints ................ 22

STATEMENT OF RELATED CASES ...................................................... 25

STANDARD OF REVIEW ........................................................................ 25

SUMMARY OF THE ARGUMENT ........................................................ 26

# TABLE OF CONTENTS (cont'd)

Page

ARGUMENT ........................................................................ 32

POINT I   -   THE DISTRICT COURT INCORRECTLY
DISMISSED THE STATES' CLAIMS FOR
INJUNCTIVE RELIEF UNDER THE PSD
PROGRAM AGAINST BOTH THE PLANT'S
CURRENT AND FORMER OWNERS ............................ 32

A. The Current Owner of a Power Plant That Was
Modified Before It Was Sold May Be Subject to
Injunctive Relief Relating to the Effects of the
Modification.................................................................. 35

   1. Although the requirement to apply BACT is
first triggered for a grandfathered plant when
a major modification occurs, the obligation
continues thereafter for as long as the modified
plant operates.......................................................... 35

   2. The district court incorrectly concluded that
the BACT requirement cannot apply unless a
PSD permit has been obtained in advance of
the modification....................................................... 41

   3. The buyer of a power plant is well positioned
to discover that the plant previously
underwent a major modification. ............................ 47

B. The Former Owners of a Plant That Was
Modified During Their Ownership May be
Subject to an Injunction Requiring Them To
Mitigate the Harms from Their Past Violations. ........ 51

# TABLE OF CONTENTS (cont'd)

**Page**

POINT II  -  THE STATES' CLAIMS FOR CIVIL PENALTIES
UNDER THE PSD PROGRAM WERE NOT TIME-
BARRED ........................................................................... 57

POINT III -  THE DISTRICT COURT INCORRECTLY
DISMISSED THE STATES' TITLE V CLAIMS AS A
MATTER OF LAW ........................................................... 63

    A. The Title V Permit Is Deficient Because It Fails
To Include a BACT Emission Limitation for Each
of the Modified Units. .................................................. 64

    B. The Plant's Owners Are Violating the Title V
Operating Permit by Operating the Plant with
Modifications Not Authorized in the Permit. .............. 65

POINT IV -  THE DISTRICT COURT WRONGLY DISMISSED
THE CLAIMS UNDER PENNSYLVANIA LAW AS
A MATTER OF LAW ....................................................... 67

CONCLUSION ........................................................................ 68

CERTIFICATIONS

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbas v. Dixon,*
  480 F.3d 636 (2d Cir. 2007) ............................................................... 57

*Ala. Power Co. v. Costle,*
  636 F.2d 323 (D.C. Cir. 1979) ............................................................ 14

*Am. Lung Ass'n of N.J. v. Kean,*
  871 F.2d 319 (3d Cir. 1989) ................................................................. 8

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ........................................................................... 54

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ........................................................................... 38

*Envtl. Def. v. Duke Energy Corp.,*
  549 U.S. 561 (2007) ........................................................................... 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ........................................................................ 9-10

*Goodman v. Praxair, Inc.,*
  494 F.3d 458 (4th Cir. 2007) ............................................................. 57

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,*
  484 U.S. 49 (1987) ............................................................................. 52

*Hanover Shoe, Inc. v. United Shoe Machinery Co.,*
  392 U.S. 481 (1968) ........................................................................... 40

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ........................................................................... 61

*McTernan v. City of York,*
  564 F.3d 636 (3d Cir. 2009) ............................................................... 25

iv

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                    **Page(s)**

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*,
  480 F.3d 410 (6th Cir. 2007)....................................................38, 39, 58

*New Jersey v. Reliant Energy Mid-Atl. Power Holdings, LLC*,
  Civ. A. No. 07-cv-5298, 2009 WL 3234438
  (E.D. Pa. Sept. 30, 2009)..............................................................42, 50

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005)...................................................................15

*New York v. EPA*,
  443 F.3d 880 (D.C. Cir. 2006)...............................................................14

*New York v. Niagara Mohawk Power Corp.*,
  263 F. Supp. 2d 650 (W.D.N.Y. 2003) ..........................................43, 53

*New York v. Niagara Mohawk Power Corp.*,
  No. 02-cv-24S, 2003 WL 23356447
  (W.D.N.Y. Dec. 31, 2003) ........................................................50, 65, 67

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946)................................................................................52

*Postow v. OBA Fed. Sav. & Loan Ass'n*,
  627 F.2d 1370 (D.C. Cir. 1980)............................................................39

*San Francisco BayKeeper, Inc. v. Tosco Corp.*,
  309 F.3d 1153 (9th Cir. 2002)...............................................................62

*Shiffler v. Schlesinger*,
  548 F.2d 96 (3d Cir. 1977) ...................................................................56

*Sierra Club v. Dairyland Power Coop.*,
  No. 10-cv-303, 2010 WL 4294622
  (W.D. Wis. Oct. 22, 2010)......................................................37, 39, 60

*Sierra Club v. Portland Gen. Elec. Co.*,
  663 F. Supp. 2d 983 (D. Or. 2009)......................................................39

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                          **Page(s)**

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998) ................................................................. 52

*Sw. Pa. Growth Alliance v. Browner*,
121 F.3d 106 (3d Cir. 1997) ............................................. 7, 8

*U.S. Pub. Interest Research Group v.*
*Atl. Salmon of Maine, LLC*,
339 F.3d 23 (1st Cir. 2003) ........................................... 51, 54

*United States v. Am. Elec. Power Serv. Corp.*,
136 F. Supp. 2d 808 (S.D. Ohio 2001) ............................... 56

*United States v. Anthony Dell'Aquilla Enters.*,
150 F.3d 329 (3d Cir. 1998) ................................................ 62

*United States v. Chevron, U.S.A., Inc.*,
639 F. Supp. 770 (W.D. Tex. 1985) .................................... 58

*United States v. Cinergy Corp.*,
582 F. Supp. 2d 1055 (S.D. Ind. 2008) .............................. 54

*United States v. Cinergy Corp.*,
623 F.3d 455 (7th Cir. 2010) ......................................... 13, 36

*United States v. Duke Energy Corp.*,
278 F. Supp. 2d 619 (M.D.N.C. 2003),
*aff'd on other grounds*, 411 F.3d 539 (4th Cir. 2005),
*vacated on other grounds sub nom. Envtl. Defense v. Duke*
*Energy Corp.*, 549 U.S. 561 (2007) .................................... 39

*United States v. Edelkind*,
525 F.3d 388 (5th Cir. 2008) ......................................... 39, 40

*United States v. Ill. Power Co.*,
245 F. Supp. 2d 951 (S.D. Ill. 2003) .................................. 50

vi

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                 **Page(s)**

*United States v. ITT Continental Baking Co.,*
 420 U.S. 223 (1975) ................................................................ 40

*United States v. La. Generating, LLC,*
 No. 09-100-JJB, 2011 WL 6012997 (M.D. La. Dec. 1, 2011) ........ 50, 65

*United States v. Lane Labs-USA Inc.,*
 427 F.3d 219 (3d Cir. 2005) ................................................... 53

*United States v. Marine Shale Processors,*
 81 F.3d 1329 (5th Cir. 1996) .................................................. 37

*United States v. Midwest Generation, LLC,*
 694 F. Supp. 2d 999 (N.D. Ill. 2010) ....................................... 51

*United States v. Midwest Generation, LLC,*
 781 F. Supp. 2d 677 (N.D. Ill. 2011) ....................................... 50

*United States v. Price,*
 688 F.2d 204 (3d Cir. 1982) ................................................... 52

*United States v. Telluride Co.,*
 146 F.3d 1241 (10th Cir. 1998) ............................................... 32

*Weinberger v. Romero-Barcelo,*
 456 U.S. 305 (1982) ........................................................ 52, 54

*Wheeler v. Heckler,*
 787 F.2d 101 (3d Cir. 1986) ................................................... 38

*Williams v. Runyon,*
 130 F.3d 568 (3d Cir. 1997) ................................................... 56

*Wis. Elec. Power Co. v. Reilly,*
 893 F.2d 901 (7th Cir. 1990) ............................................ 11, 13, 15, 45

vii

# TABLE OF AUTHORITIES (cont'd)

**Statutes**                                                          **Page(s)**

*Federal*

28 U.S.C.
  § 1291.................................................................................2
  § 2462...............................................................................57

42 U.S.C. (Clean Air Act)
  § 7401.................................................................................7
  § 7408.................................................................................7
  § 7409.................................................................................8
  § 7410.................................................................................8
  § 7411...............................................................................66
  § 7413........................................................................ passim
  § 7470...............................................................................59
  §§ 7470-7482.....................................................................10
  § 7475........................................................................ passim
  § 7477.................................................................................1
  § 7479.............................................................11, 12, 17, 64
  § 7602...............................................................................36
  § 7604........................................................................ passim
  § 7661a...................................................................... passim
  § 7661c.......................................................................17, 64

Clean Air Act Amendments of 1977,
  Pub. L. No. 95-95, 91 Stat. 685...........................................10

*State*

35 P.S. (Air Pollution Control Act)
  § 4001 *et seq.*...................................................................11
  § 4009.3.......................................................................58, 67
  § 4013.2.............................................................................48

## TABLE OF AUTHORITIES (cont'd)

**Regulations & Administrative Sources**                    **Page(s)**

*Federal*

40 C.F.R.
§ 19.4 .................................................................................. 9, 59
§ 52.21 ...................................................... 12, 14, 15, 38
§ 52.2020 ............................................................................... 8
§ 52.2058 ................................................................... 12, 67
§ 60.43Da .................................................................. 13, 44

Final Approval of Pa.'s Operating Permit Program,
61 Fed. Reg. 39,597 (July 30, 1996) .................................... 17

Operating Permit Program, 57 Fed. Reg. 32,250 (July 21, 1992) .......... 16

Requirements for Implementation Plans,
57 Fed. Reg. 32,314 (July 21, 1992) .................................... 15

*State*

25 Pa. Code
§ 121.1 ................................................................................ 17
§ 127.11 ............................................................................... 11
§§ 127.81-.83 ............................................................ 12, 67
§ 127.414 ....................................................................... 17, 66
§ 127.424 ............................................................................. 17
§ 127.431 ............................................................................. 17
§ 127.443 ...................................................................... 11, 38
§ 127.444 ............................................................................. 11
§ 127.445 ............................................................................. 18
§ 127.450 ............................................................................. 18
§ 127.502 ...................................................................... 17, 64
§ 127.521 ............................................................................. 17
§ 135.3 ......................................................................... 21, 48

## TABLE OF AUTHORITIES (cont'd)

**Miscellaneous Authorities**                                    **Page(s)**

EPA, NSR/PSD Database Index,
    http://www.epa.gov/region7/air/nsr/nsrindex.htm ............................ 15

H.R. Rep. No. 95-294 (1977),
    *as reprinted in* 1977 U.S.C.C.A.N. 1077 ........................................ 9, 59

Johnsson, Julie, *Coal-Plant Plunge Threatens Billions in Pollution
    Spend* (June 25, 2012), http://www.bloomberg.com/news/2012-
    06-24/coal-plant-plunge-threatens-billions-in-pollution-
    spend.html. ........................................................................................... 21

## STATEMENT OF JURISDICTION

In January 2011, the United States commenced an action under 42 U.S.C. §§ 7413(b) and 7477 to enforce the Clean Air Act (codified at 42 U.S.C. § 7401 *et seq.*) against the current and former owners and operators of the Homer City Generating Station, a large coal-fired power plant in western Pennsylvania that was originally built in the 1960s. The United States alleges that defendants failed to comply with limitations imposed by the Clean Air Act on the emission of sulfur dioxide and further failed to obtain a required permit authorizing modifications to the plant that substantially increased its sulfur dioxide emissions. The States of New York and New Jersey and Pennsylvania Department of Environmental Protection (PaDEP) (together, the States) intervened as plaintiffs, bringing suit for civil penalties and injunctive relief under 42 U.S.C. § 7604(a)(1) and (a)(3) based on similar allegations.

On October 12, 2011, the United States District Court for the Western District of Pennsylvania (McVerry, J.) dismissed the complaints under Federal Rule of Civil Procedure 12(b)(6). The court held principally that any violation of the Clean Air Act's permitting and

emissions-limitation requirements occurred in the early to mid-1990s when the plant was modified. The court concluded that the plant's current owners and operator (together, current owners), who bought the plant after it was modified, could not be ordered to bring the plant into compliance with the Act or subjected to civil penalties for having failed to do so. The court also held that the plant's former owners could not be ordered to remedy the effects of their statutory violations.

The States and the United States timely filed notices of appeal under Federal Rule of Appellate Procedure 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

The Clean Air Act's Prevention of Significant Deterioration of Air Quality (PSD) program applies to all power plants built after its 1977 effective date, but exempts preexisting plants until such time as they undergo a major modification. The program requires a grandfathered power plant, once it undergoes any major modification, to obtain a permit and operate thereafter in compliance with rigorous emissions limitations. The Act's Title V program requires power plants to operate

in compliance with an operating permit that collects all conditions governing the plant's operations under the statute. The Pennsylvania Air Pollution Control Act and regulations promulgated under it implement the two programs. The questions presented are:

1.    Whether injunctive relief is available to compel the Homer City plant's current owners to bring the plant into compliance with the emissions requirements of the PSD program, because the failure to comply with those requirements is a continuing violation that persists as long as a modified facility is operated without controlling emissions as required, not a one-time violation that occurs only at the moment the facility is modified, as the district court held. (Joint Appendix ("J.A.") 26-28; 113-116.)

2.    Whether injunctive relief is available to compel the plant's former owners (as well as its current owners) to mitigate the public-health and environmental harms resulting from their past failures to install the required emissions controls when the plant was modified and thereafter. (J.A. 28-32; 113-116.)

3.    Whether civil penalties are available against the current owners under the PSD program, and not time-barred, because the

violations have continued during the entire time the modified plant operated without meeting required emissions limits, and did not occur only at the moment the plant was modified. (J.A. 23-26; 113-116.)

4.      Whether the Homer City plant's current owners may be liable for operating the plant in violation of the Title V program where they (a) failed to obtain a Title V permit that requires the plant's two modified generating units to comply with the PSD program's emission limitations, and (b) are violating the condition of their Title V permit that authorizes the operation of those generating units only in unmodified form. (J.A. 32-36; 121-126.)

5.      Whether the Homer City plant's violations of the Clean Air Act also state a violation of Pennsylvania law. (J.A. 36-40; 119-121.)

## STATEMENT OF THE CASE

The Homer City coal-fired power plant was originally built in the 1960s and was therefore initially exempt from the requirements of the PSD program under the program's grandfathering rule. In the 1990s, the plant's then-owners made major modifications to two of the plant's generating units that caused the units' emissions of sulfur dioxide to

increase substantially, thereby causing those units to lose their grandfathered status under the Clean Air Act's PSD program and triggering the PSD program's permitting and pollution-control requirements. But the plant's owners did not apply for the required permit and did not install controls to limit the plant's emission of sulfur dioxide. The plant was later sold, and its current owners have continued to operate the modified plant without bringing it into compliance with the Act. The plant is presently one of the Nation's largest emitters of sulfur dioxide, which causes respiratory illnesses and premature death from heart attacks and also produces acid rain that degrades the quality of our lakes and streams.

The emissions controls that the Act requires are standard in the power-generating industry and would have eliminated 95 percent or more of the modified generating units' emissions of sulfur dioxide. The failures of the plant's former and current owners to limit the plant's pollution have resulted in the plant's emission of more than one million tons of excess sulfur dioxide into the ambient air of Pennsylvania, New Jersey, and New York.

To address the ongoing threat to the public health and the environment caused by the Homer City plant's poorly controlled emissions, the States joined a suit brought by the United States against the plant's current and former owners. The plaintiffs sought an injunction requiring the defendants to bring the plant into compliance with the Clean Air Act and to mitigate harms caused by the plant's past unlawful emissions, as well as an order imposing civil penalties against the plant's current owners.

The United States District Court for the Western District of Pennsylvania (McVerry, J.) granted the defendants' motions to dismiss. The court held that the failure of the owner of a grandfathered power plant to comply with the requirements of the PSD program when undertaking a major modification of the plant is a one-time violation of the Clean Air Act that occurs at the moment the plant is modified, at least in cases where the plant changed ownership following the modification. The court held that injunctive relief was unavailable against the current owners of the Homer City plant as a matter of law, because the only violations of the PSD program occurred before they bought the plant. The court further held that claims for civil penalties

against the current owners were time-barred, because the plant was modified more than five years before the suit was brought. The court rejected claims for injunctive relief against the plant's former owners on the ground that it would be inappropriate in this case to require the former owners to mitigate the harms from their past violations of the Act. The court also dismissed the Title V claim on the ground that Title V does not independently require compliance with the PSD requirements, and dismissed the state-law claims principally for the same reasons as the federal claims.

## STATEMENT OF FACTS

### A.   The Clean Air Act Aims To Limit Air Pollution From Newly Constructed or Modified Power Plants

The Clean Air Act is designed to "protect and enhance the quality of the Nation's air resources . . . to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The Act directs the U.S. Environmental Protection Agency to identify air pollutants that are likely to endanger the public health or welfare. *See id.* § 7408(a); *Sw. Pa. Growth Alliance v. Browner*, 121 F.3d

106, 109 (3d Cir. 1997). For each such pollutant, EPA promulgates a national ambient air quality standard (NAAQS) setting the maximum allowable concentration of the pollutant. *See* 42 U.S.C. § 7409(a); *Sw. Pa. Growth Alliance*, 121 F.3d at 109.

The Clean Air Act establishes a scheme of "cooperative federalism" in which the federal government and the states share responsibility for improving air quality and reducing air pollution. *Am. Lung Ass'n of N.J. v. Kean*, 871 F.2d 319, 322 (3d Cir. 1989). Within three years after EPA establishes a NAAQS for a given pollutant, each state must submit a state implementation plan (often called a SIP) to EPA specifying enforceable measures to reduce emissions of the pollutant and to enable the state to attain and maintain the NAAQS. 42 U.S.C. § 7410(a)(2)(A)-(K); *see Sw. Pa. Growth Alliance*, 121 F.3d at 109-10. EPA has approved Pennsylvania's state implementation plan. *See* 42 U.S.C. § 7410(k); 40 C.F.R. § 52.2020(b).

The Clean Air Act contains two overlapping permitting programs to control emissions from electric power plants, which are among the largest polluters of our air. First, the Prevention of Significant Deterioration program aims to ensure that newly constructed or

8

significantly modified facilities do not harm air quality; the PSD program requires those facilities to obtain a permit before the construction or modification begins and then to operate in accordance with strict emissions-limitation standards afterwards. Second, the Title V program requires all major facilities—whether new or modified or existing—to obtain an operating permit that enumerates all of their obligations under the Act, including their obligations under the PSD program.

To ensure that facility owners and operators comply with these two programs, Congress authorized the federal government, the states, and affected private parties to bring civil enforcement actions against owners and operators that fail to do so. *See* 42 U.S.C. §§ 7413(b), 7604(a). In such an action, a federal court may issue an injunction compelling compliance with any "emission standard or limitation" under the Act. *Id.* § 7604(a). Congress also authorized civil penalties of up to $37,500 per statutory violation, 40 C.F.R. § 19.4, to encourage facility owners and operators "to implement measures that will insure violations will not occur," H.R. Rep. No. 95-294 at 71 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 1077, 1149; *see also Friends of the*

*Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000) (civil penalties under the Clean Water Act serve a deterrence function). The Act permits a court to tailor the penalty amount, subject to the statutory cap, to the circumstances of the violator and the violation, taking into account such factors as the economic impact of the penalties on the violator; the violator's history of compliance with the statute; the economic benefit the violator derived from the violation; the seriousness and duration of the violation; and any other factors that "justice may require." 42 U.S.C. § 7413(e)(1).

### 1. The PSD Program Prevents Degradation of Air Quality by Regulating Emissions from New and Modified Sources of Air Pollution

Congress added the PSD program, 42 U.S.C. §§ 7470-7482, to the Clean Air Act in 1977 to prevent degradation in our air quality, after concluding  that the Act previously had done too little to achieve its "ambitious goals." *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567-68 (2007) (quotation marks omitted); *see* Clean Air Act Amendments of 1977, Pub. L. No. 95-95, 91 Stat. 685.

Congress determined that the most efficient way to prevent air-quality degradation from power plants (and other major stationary

sources of air pollution) in areas of the country that meet the relevant NAAQS was to require the owners and operators of newly built plants and existing plants that are significantly modified to comply with eight enumerated requirements under the PSD program. *See* 42 U.S.C. § 7475; *id.* § 7479(2)(C) (defining the term "construction" as used in § 7475 to include "the modification . . . of any source or facility"); *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) ("*WEPCO*"). Three of those eight PSD requirements are especially relevant here.

First, before beginning construction of a new plant or undertaking a significant modification of an existing plant, the owner or operator must obtain a PSD permit that specifies the emissions limitations that will apply to the facility. 42 U.S.C. § 7475(a)(1).[1] A PSD permit serves both as an approval to construct the plant or undertake the modification (which expires after eighteen months) and as an ongoing

---

[1] Pennsylvania has a "plan-approval" program, analogous to the PSD program, under the state Air Pollution Control Act, 35 P.S. § 4001 *et seq*. An owner intending to modify an existing source must submit an application to PaDEP for plan approval. The owner must also obtain an operating permit that incorporates the conditions of the plan approval. 25 Pa. Code §§ 127.11, 127.443-.444. (Until 1994, this provision was found at 25 Pa. Code § 127.21.)

authorization to operate the new or modified facility in compliance with emissions limitations stated in the permit. 40 C.F.R. § 52.21(r)(1)-(2).

Second, the PSD program mandates that any newly constructed or modified facility must be "subject to the best available control technology," or BACT, to limit pollution once the facility begins or resumes operations. 42 U.S.C. § 7475(a)(4). EPA regulations specifically provide that modified facilities "shall meet" each applicable emission limitation and "shall apply" BACT. 40 C.F.R. § 52.21(j)(1), (3). Pennsylvania's state implementation plan incorporates these requirements by reference. *See id.* § 52.2058; 25 Pa. Code §§ 127.81-.83.

The BACT standard does not mandate a specific technology, but rather sets a level of emissions determined by the permitting authority to be the maximum achievable reduction at a particular facility, taking into account energy, environmental, and economic considerations. 42 U.S.C. § 7479(3). Achieving the BACT standard often requires the addition of technology to control emissions, and may also require other measures, such as the use of less-polluting fuel. Although BACT may lead to more stringent requirements for a particular facility based on the facility's individual characteristics, and those requirements are

12

commonly stated in the PSD permit discussed above, EPA regulations establish a maximum BACT emissions level for each regulated pollutant for each category of facilities. *See* 40 C.F.R. § 60.43Da.

Third, the PSD program requires the owner or operator of a new or significantly modified plant to monitor emissions on a continuing basis during plant operations to determine the effect of the facility's operations on air quality in downwind areas. 42 U.S.C. § 7475(a)(7).

The PSD program's obligations are triggered when a facility owner or operator undertakes to construct a new plant or to modify an existing plant in a way that is likely to significantly increase emissions. Congress grandfathered facilities already in existence when the PSD program was enacted from complying with the PSD program, but only as long as those facilities continued to operate without significant modification. Congress recognized that retrofitting all existing plants with pollution-control technology would be difficult and costly. *See WEPCO*, 893 F.2d at 909. At the same time, Congress expected all power plants to come under the PSD program over time as existing facilities wore out and were either modified or replaced with new plants. *See United States v. Cinergy Corp.*, 623 F.3d 455, 457 (7th Cir.

13

2010) ("[T]here is an expectation that old plants will wear out and be replaced by new ones that will thus be subject to the more stringent pollution controls that the Act imposes on new plants.").

Only "major" modifications of an existing plant lead to a loss of grandfathered status. A major modification is "any physical change in or change in the method of operation of" a stationary source that would result in a "significant net emissions increase" and that is not "routine maintenance, repair, or replacement." 40 C.F.R. § 52.21(b)(2).[2] Thus, an owner contemplating a modification to a grandfathered facility must first consider whether the modification is more than routine, and, if so, determine whether the modification will cause a significant increase in net emissions.

If the owner determines that a modification is not routine but will not cause a sufficiently large emissions increase to trigger the PSD requirements, it must monitor the plant's emissions for five years thereafter to test the accuracy of that determination. *See id.*

---

[2] The exception for routine maintenance, repair, or replacement applies only to physical changes that would have a *de minimis* effect on emissions. *See New York v. EPA*, 443 F.3d 880, 890 (D.C. Cir. 2006); *Ala. Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979).

§ 52.21(r)(6)(iii). If the actual increase in emissions during the period meets or exceeds the regulatory threshold, *see id.* § 52.21(23)(i), the facility is subject to, and the owner must comply with, the requirements of the PSD program, including the BACT requirement, *see id.* § 52.21(r)(6); Requirements for Implementation Plans, 57 Fed. Reg. 32,314, 32,325 (July 21, 1992) (stating that if post-modification monitoring shows a significant increase in emissions, the facility would become subject to PSD requirements "at that time"); *see also New York v. EPA*, 413 F.3d 3, 33-35 (D.C. Cir. 2005) (noting that post-project monitoring and recordkeeping of emissions can result in a facility having to comply with the PSD requirements after a modification is completed).

An owner that is uncertain whether a modification will result in loss of grandfathered status may request guidance from the state permitting agency or EPA. *Cf. WEPCO*, 893 F.2d at 906. EPA maintains an online database containing past "applicability determinations" that an owner may also consult for guidance. *See* EPA, NSR/PSD Database Index, http://www.epa.gov/region7/air/nsr/nsrindex.htm (last visited Nov. 12, 2012). An advance determination by EPA or the state

permitting agency that a modification will not significantly increase emissions does not relieve the owner of the five-year monitoring obligation if otherwise applicable.

> **2.   The Title V Program Collects All Applicable Conditions of a Plant's Ongoing Operation, Including Emissions Limitations, in a Single Permit**

Title V of the Clean Air Act, added in 1990, works together with the PSD program (and other provisions) to ensure compliance with the Act's requirements. The purpose of the Title V program is to collect in one place all applicable requirements for a source's compliance with the Act. *See* Operating Permit Program, 57 Fed. Reg. 32,250, 32,251 (July 21, 1992). Title V thus requires every "major source" of a regulated pollutant and every source subject to the PSD program to obtain a Title V permit and operate in compliance with the conditions stated in that permit. 42 U.S.C. § 7661a(a).

The Title V program requires a facility's owner or operator to submit a timely and complete permit application to the state permitting agency that includes emissions-related information specific to the design and operation of the facility and other information necessary to

16

assure compliance with all "applicable requirements." *Id.* § 7661c(a). Under Pennsylvania's regulations, the permitting agency must provide an opportunity for public notice and comment before granting or denying the permit. 25 Pa. Code §§ 127.424, .431 & .521. The permit applicant has an ongoing duty to update or correct information it has submitted. *Id.* § 127.414(b).

Each Title V operating permit must include "emissions limitations" and any other conditions necessary to ensure compliance with applicable requirements of the Clean Air Act. 42 U.S.C. § 7661c(a); 25 Pa. Code § 127.502. BACT is an emission limitation that the Title V permit is required to contain, *see* 42 U.S.C. § 7479(3), as well as an applicable requirement that the Title V permit aims to enforce, *see* 25 Pa. Code § 121.1.

PaDEP implements Title V through an operating-permit program that has been approved by EPA. *See* Final Approval of Pa.'s Operating Permit Program, 61 Fed. Reg. 39,597, 39,599 (July 30, 1996). State regulations enable the purchaser of a plant that has previously been modified without coming into compliance with the PSD program to incorporate PSD requirements into the facility's operating permit,

17

including the requirement to apply BACT. *See, e.g.*, 25 Pa. Code § 127.450(a)(5) (providing for permit amendments to incorporate PSD requirements); *id.* § 127.445 (facility owners may propose a schedule to enable it to come into compliance over period of time).

## B. The Homer City Plant Was Significantly Modified in the Early and Mid 1990s, Yet Has Never Complied With the Clean Air Act's Emissions Limitations

Because the district court dismissed this case at the pleading stage, without any discovery or evidentiary development, this factual summary is drawn from the allegations of the complaint filed by the United States and the complaints in intervention filed by the States.

The Homer City power plant is a major coal-fired plant located in Indiana County, Pennsylvania that comprises three electric generating units. (J.A. 95-96, ¶¶ 19-21.) Two of the generating units, Unit 1 and Unit 2, were constructed in 1969 and thus were grandfathered under the PSD program when the program was enacted in 1977. (*See* J.A. 95, ¶ 20.)

In 2009, the plant emitted about 101,000 tons of sulfur dioxide (J.A. 96, ¶ 22.), making it one of the largest sulfur-dioxide polluters in

18

the Nation for the year.[3] The plant's emission of sulfur dioxide contributes to respiratory illnesses and heart attacks and to the production of acid rain in Pennsylvania and in New York and New Jersey, which are downwind of the plant. (J.A. 92-93, ¶ 5.) A recent analysis ranked Pennsylvania first in the Nation, and New York third, in the number of premature deaths, hospital admissions, and heart attacks attributable to the fine particulate matter that results from sulfur dioxide emissions. (J.A. 92-93, ¶ 5.) Fine particulate matter is also toxic to aquatic life and vegetation. (J.A. 92-93, ¶ 5.)

In 2009, over 95 percent of the Homer City plant's sulfur dioxide emissions came from the two grandfathered generating units. (J.A. 95-96, ¶¶ 20, 22.) The third generating unit (Unit 3), which was

---

[3] According to EPA's Air Markets Program Data, the Homer City plant generated 48,108 tons of sulfur dioxide emissions during the first half of 2012, the most of any plant in the U.S. (The EPA's database can be queried at http://ampd.epa.gov/ampd.) On April 2, 2012, the plant's operator received approval from PaDEP to install scrubbers on Units 1 and 2 to comply with non-PSD regulatory obligations under the Clean Air Act. The plant is expected to install the scrubbers by 2015. Although the scrubbers, if installed, should substantially decrease the plant's emissions of sulfur dioxide, the current owners have not proposed to meet BACT emission levels. Nor would these changes address the harm caused by the plant's decades of excess emissions.

constructed later, has been fitted with standard "scrubber" technology that significantly reduces sulfur dioxide emissions. (J.A. 95-96, ¶ 20.)

In the early and mid-1990s, the plant's then-owners, New York State Electric & Gas Co. and Pennsylvania Electric Co., replaced major components of Units 1 and 2. (*See* J.A. 94, ¶¶ 12-13; J.A. 114, ¶¶ 103, 104; J.A. 117, ¶¶ 122, 123.) The then-owners nonetheless failed to apply for a PSD permit or even to consult with EPA or PaDEP as to whether a permit would be required. (J.A. 114, ¶ 107; J.A. 117, ¶ 126.) They also failed to ensure that the modified units' emissions would comply with BACT. (J.A. 115, ¶ 111; J.A. 118, ¶ 130.)

In 1995, the then-owners applied for a Title V operating permit, which the plant required because it is a "major source" subject to the Title V program. (J.A. 80, ¶ 61.) The specifications and plans they submitted with the application, however, did not reflect the modifications the owners had made to Units 1 and 2. (J.A. 123, ¶ 154.) Nor did the owners ever correct or update their application to reflect those modifications. (J.A. 123-124, ¶ 156.)

In 1999, while the Title V application remained pending, the plant was sold for almost two billion dollars[4] to EME Homer City Generation, L.P., which subsequently transferred ownership to the plant's current owners, Homer City OL1 LLC through Homer City OL8 LLC, while assuming the role of the plant's operator. (J.A. 95, ¶¶ 15-16.) Under state law, the plant's new owners had access to emissions reports that showed a significant increase in sulfur dioxide emissions after the modifications to Units 1 and 2 in the 1990s. *See* 25 Pa. Code § 135.3. Whether or not they considered these reports, they did not correct or update the plant's then-pending Title V application.

PaDEP issued a Title V permit for the plant in 2004. Because neither the plant's former nor current owners had disclosed to PaDEP that Units 1 and 2 had undergone major modifications causing a significant increase in sulfur dioxide emissions, the Title V permit does not contain a BACT emission limitation for either of those units. (J.A. 123, ¶¶ 153-154.) The Title V permit expressly authorizes operation of

---

[4] *See, e.g.*, Julie Johnsson, *Coal-Plant Plunge Threatens Billions in Pollution Spend* (June 25, 2012), http://www.bloomberg.com/news/2012-06-24/coal-plant-plunge-threatens-billions-in-pollution-spend.html.

the plant only "in accordance with specifications" provided in the permit application, which did not reflect the modifications to Units 1 and 2. (J.A. 96-97, ¶ 24; J.A. 123, ¶ 154.) The permit states that the permit holder must inform PaDEP if it becomes aware that "any relevant facts were omitted or incorrect information was submitted in the permit application." (J.A. 97, ¶ 26.)

## C.  The District Court's Dismissal of the Complaints

In January 2011, the United States commenced an action under the Clean Air Act against the current and former owners of the Homer City plant, alleging violations of the Act's PSD permitting and pollution-control provisions and the Title V operating-permit requirements. The States intervened as plaintiffs. The plaintiffs sought injunctive relief requiring the defendants to bring the plant into compliance with the Clean Air Act, including requiring its owners to implement BACT and requiring its owners and former owners to mitigate harms caused by their unlawful pollution. The plaintiffs also sought to impose civil penalties against the current owners for their violations of the Act and related state law. *See* 42 U.S.C. § 7413(b), (e)(1).

On October 12, 2011, the district court dismissed the complaints under Rule 12(b)(6). Without ordering any discovery, receiving any evidence, or holding an evidentiary hearing, the court ruled that all the claims in the complaints failed as a matter of law. The court first rejected plaintiffs' claims for civil penalties under the PSD program brought against the plant's current owners.[5] The court held that only the plant's former owners could be liable for violating the PSD program, when they failed to seek a PSD permit before undertaking to modify the plant. (J.A. 23-26.) The court ruled that claims against the current owners were also time-barred by the five-year statute of limitations, given the "one-time" nature of the violations. (J.A. 23-26.)

Although acknowledging that no statute of limitations applied to plaintiffs' claims for injunctive relief under the PSD program (J.A. 28), the court dismissed those claims as well. It held that an injunction could not be imposed against the plant's current owners based on the former owners' violations of the PSD program's requirements. (J.A. 26-

---

[5] Contrary to the district court's statement (J.A. 23), the States did not abandon their claim for civil penalties against the plant's current owners (*see* Pl.-Intervenors' Mem. of Law in Opp'n to Defs.' Mots. to Dismiss at 37 n.15, Dist. Ct. Dkt. # 100).

28.) The court said that the claims for an injunction against the former owners presented a "more difficult question" (J.A. 28), but rejected the claims as inadequately pleaded and "novel," saying that injunctive relief is a "rare and extraordinary remedy" (J.A. 29). The court also said that plaintiffs had failed to plead facts explaining why the suit was filed long after the plant was modified. (J.A. 31.)

The court dismissed plaintiffs' claims under the Title V program against the current owners,[6] holding that the PSD requirements are not "incorporated" into the Title V program and that plaintiffs had not identified "any affirmative condition" in the Title V permit that was being violated. (J.A. 33-34.) The court also suggested, without deciding, that claims alleging flaws in a permit application might have to be brought in an administrative proceeding rather than in a civil enforcement action. (J.A. 35-36.)

Finally, the court dismissed PaDEP's claims under Pennsylvania law, holding that state law does not require the owner of a modified

---

[6] The States do not challenge dismissal of their Title V claims against the former owners. (J.A. 32.)

plant to comply with PSD requirements in operating the plant. (J.A. 37-40.)[7]

## STATEMENT OF RELATED CASES

The States are aware of no related cases or proceedings.

## STANDARD OF REVIEW

The Court reviews *de novo* a district court's dismissal of a complaint under Rule 12(b)(6) for failure to state a claim. *McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir. 2009). The Court "must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* (quotation marks omitted).

---

[7] PaDEP does not challenge dismissal of its statutory nuisance claim. (J.A. 40-41.)

## SUMMARY OF THE ARGUMENT

The Clean Air Act charges the owner of a grandfathered power plant with the duty to obtain a permit and apply BACT emissions limitations once the plant undergoes a major modification. The owners of the Homer City plant repeatedly failed to satisfy those requirements when they made major modifications to the plant in the 1990s. And after the plant was sold, the purchasers continued to operate the plant without the required permit or emissions controls. As a result, the plant has operated unlawfully for more than a decade and has consistently been one of the largest sources of sulfur dioxide emissions in the Nation.

Yet, when the federal government and the States brought suit against the plant's current and former owners to enforce the requirements of the Clean Air Act, the district court dismissed their claims on the face of the complaint. The court ruled that the only violation of the Clean Air Act could have occurred at the moment the plant was modified, and held that the plant's later change of ownership means that injunctive relief is now unavailable against any party as a matter of law to remedy the ongoing public-health and environmental threats from the plant's emissions. The court held that the plant's

26

current owners cannot be enjoined to limit the plant's emissions prospectively, and its former owners cannot be required to mitigate the continuing harmful effects of their past statutory violations. The court also dismissed the claims for civil penalties against the plant's current owners as untimely.

These rulings were fundamentally misguided. The district court did not hold that the rulings were compelled by the text of the Clean Air Act. Instead the court relied principally on a misplaced concern for fairness to the plant's current owners and a misunderstanding of the public policies reflected in the statute. The district court's ruling, if left undisturbed, would remove key incentives for private actors to comply with the Act, and it would also prevent government environmental agencies from effectively enforcing the Act's requirements. The States' claims for injunctive relief and civil penalties should be allowed to proceed to discovery.

*First*, the district court erroneously dismissed as a matter of law the States' claims for injunctive relief under the PSD program against the defendants that currently own and operate the plant. The court reasoned that the plant's current owners have not violated the Clean

Air Act because any statutory violations occurred at the moment that the former owners made modifications without complying with the PSD requirements, which happened before the current owners bought the plant. But the Act imposes conditions that govern the ongoing operation of a previously grandfathered power plant on a continuing basis after it undergoes a major modification; the major modification is the trigger for those requirements, but the obligation to comply does not end just because the requirements are flouted or ignored at the moment of modification. The plant's current owners thus violate the PSD requirements each day that they operate the plant without bringing it into compliance.

The district court allowed misplaced concerns for fairness to the plant's current owners, as purchasers of the plant following its modification, to drive its interpretation of the statute. The PSD program governs large sources of air pollution; the commercial parties that purchase such facilities are well-situated to identify and remedy past unpermitted modifications through their due-diligence process and to negotiate contractual protections to address any risk that a modification may go undetected in due diligence. Rather than requiring

purchasers to ensure that the plants they buy are in compliance, the district court's ruling would instead shift the burden to the government to detect the violation before a plant ever changes ownership.

*Second*, the district court erred by dismissing as a matter of law the States' claims for injunctive relief against the former owners under the PSD program. No statute of limitation applies to those claims, and, contrary to the court's reasoning, the court's broad equitable powers authorize entry of an injunction to compel the former owners to remedy the harmful effects of their past violations. The court's dismissal of the claims on the face of the complaint denied the States the opportunity to demonstrate, on a full record, the appropriateness of such injunctive relief.

The district court's approach in dismissing all claims for injunctive relief as a matter of law would mean that any power plant (or other major polluter) would become permanently beyond the reach of injunctive relief when it is sold to someone else. No party could be compelled thereafter to bring the plant into compliance even though its harmful emissions continue unabated. In the most extreme case, the court's ruling would mean that relief is unavailable even where an

owner intentionally makes modifications without complying with the PSD requirements and then sells the plant to a buyer that is aware of the violations.

*Third*, the district court incorrectly held that the plant's current owners are not subject to any civil penalty for operating the plant out of compliance with the PSD program. Contrary to the court's conclusion, the claims for civil penalties are timely because the PSD program imposes ongoing obligations that the plant's current owners are continuing to violate. The court's ruling would eviscerate civil penalties as a means to deter noncompliance with the PSD program: the court's approach would forbid the imposition of any civil penalty if an owner's failure to apply for a permit at the time of modification goes undetected for more than five years, as it did here, and it would permit only trivial maximum penalties for violations detected within that period. Such nominal penalties would not deter violations by the sophisticated parties that own the kinds of facilities that are large sources of air pollution.

*Fourth*, in addition to improperly dismissing the States' claims under the PSD program, the district court also improperly dismissed

the States' claims under the Title V operating-permit program, which are independent of their claims under the PSD program. The plant's current owners are violating the requirements of the Title V program in two ways: (1) by operating the plant without a permit requiring the modified units to apply BACT, and (2) by violating the condition of their operating permit that authorizes the operation of those units only in unmodified form.

*Finally*, the court also wrongly dismissed PaDEP's claims under Pennsylvania's Air Pollution Control Act. That statute, like the Act, prohibits the operation of a modified facility that does not comply with BACT, and accordingly PaDEP's claims should be reinstated along with the federal claims.

# ARGUMENT

## POINT I

### THE DISTRICT COURT INCORRECTLY DISMISSED THE STATES' CLAIMS FOR INJUNCTIVE RELIEF UNDER THE PSD PROGRAM AGAINST BOTH THE PLANT'S CURRENT AND FORMER OWNERS

On this motion to dismiss the complaint, the district court properly accepted as true the States' allegation that the Homer City plant has undergone major modifications that resulted in the loss of grandfathered status and triggered application of the PSD requirements. The court also acknowledged that the plant's emissions "likely would have been dramatically reduced" if the plant had complied with those requirements. (J.A. 28.) And the court further recognized that there is no statute of limitations for claims for injunctive relief to enforce the Clean Air Act. *See United States v. Telluride Co.*, 146 F.3d 1241, 1245 (10th Cir. 1998).

The court nonetheless held that injunctive relief is unavailable as a matter of law to compel the plant's current and former owners to address the ongoing threat to the public health and the environment caused by the poorly controlled pollution from the Homer City plant. The court was deeply mistaken in this ruling. Each day that the Homer

32

City plant operates without BACT emissions controls, it discharges hundreds of tons of sulfur dioxide into the ambient air, harming the public health and environment of Pennsylvania, New York, and New Jersey. (J.A. 92-93, ¶¶ 5-7.) The court erred by concluding as a matter of law that the Homer City plant's current owners could not be compelled to apply BACT—the core requirement of the PSD program—on the reasoning that the only violation of the Clean Air Act would have occurred at the moment that the former owners undertook to modify the plant without complying with the PSD program, and thus that the only violation would have happened before the plant's current owners owned or operated the plant. The court also wrongly concluded as a matter of law that injunctive relief is unavailable to compel the plant's former owners to mitigate the harmful effects of their past statutory violations.

The district court recognized that nothing in the text of the Clean Air Act compelled these rulings; instead, the court acted principally on the basis of its mistaken view of public policy and fairness to new owners. But as a matter of public policy the district court's ruling would fundamentally subvert the incentive structure of the PSD program and greatly curtail the ability of government environmental agencies to

enforce the program through claims for injunctive relief. A rule that an injunction is unavailable after a change in ownership would have the perverse effect of allowing an owner to absolve a statutory violation by selling the plant to new owners. In the most extreme case, the rule followed by the court below would mean that no injunctive relief would be available to secure prospective compliance with the PSD program even if a plant owner intentionally executed a major modification that caused the plant to lose its grandfathered status without seeking a PSD permit or otherwise complying with the PSD program, and then turned around and sold the plant soon after the modification was completed to a buyer who knew full well that the plant had not been brought into compliance.

Moreover, contrary to the district court's view, fairness principles do not support its ruling. Buyers of facilities subject to the PSD program are inevitably highly sophisticated parties. They are well equipped to discover in the course of due diligence whether a previously grandfathered plant underwent significant modifications in the past, and to obtain warranties and indemnification rights in the event that a modification could remain undiscovered after reasonable diligence. By

contrast, it is extremely difficult for government environmental agencies—which must with limited resources police an entire State or Nation—to detect that a particular power plant was modified in the past, let alone to do so before the plant ever changes ownership. The district court's rule thwarts the basic objectives of the Clean Air Act, and should be reversed.

### A. The Current Owner of a Power Plant That Was Modified Before It Was Sold May Be Subject to Injunctive Relief Relating to the Effects of the Modification.

#### 1. Although the requirement to apply BACT is first triggered for a grandfathered plant when a major modification occurs, the obligation continues thereafter for as long as the modified plant operates.

The PSD program aims to ensure that all power plants (and other major emitting facilities) located in designated areas come under rigorous emissions limitations to prevent degradation of air quality, subject to a grandfathering rule exempting existing plants so long as they operate without significant modification. The district court recognized that by making modification of an existing, previously grandfathered plant the trigger for the PSD program, Congress did not

intend to allow plant owners to evade PSD requirements "by keeping . . . grandfathered power plants in operation indefinitely." (J.A. 13.) Still, the court concluded that if a plant's owner fails to comply with the PSD requirements at the moment it undertakes a modification, it has no continuing obligation to comply after that moment. (J.A. 22-23.)

That interpretation is contrary to the PSD program's fundamental goals, as well as its plain text. Congress intended *all* plants in regions subject to the PSD program to comply with the program's requirements at some point. *See Cinergy Corp.*, 623 F.3d at 457. New plants are subject to the requirements when they are first built, while grandfathered plants become subject to the requirements when they undergo major modifications. While modification first *triggers* the requirement to comply for an existing plant, the obligation is not extinguished merely because a plant owner defies the PSD requirements at the time the modification occurs. The statute's basic purpose is to ensure that the plant *operates* on a continuing basis with a permit and in compliance with stringent emissions limitations, and the statute therefore imposes continuing obligations that persist throughout the operations of the modified plant. *See* 42 U.S.C. § 7602(k)

(defining "emission limitation" as a requirement to limit air pollution "on a continuous basis").

The statute thus defines "ongoing obligations" that govern a plant's operations after modification. *Sierra Club v. Dairyland Power Coop.*, No. 10-cv-303, 2010 WL 4294622, at *12 (W.D. Wis. Oct. 22, 2010); *see also United States v. Marine Shale Processors*, 81 F.3d 1329, 1355-56 (5th Cir. 1996) ("The [Clean Air Act's] statutory scheme contemplates at least two different types of air permits unhappily named 'preconstruction permits' and 'operating permits,' with confusion easily resulting from the fact that preconstruction permits often include limits upon a source's operations."). The permitting, emissions, and monitoring requirements of the PSD program are all expressly directed toward the facility's continued operations after the modification: the modified facility must have a permit "setting forth emission limitations" that will govern its continued operations, 42 U.S.C. § 7475(a)(1); the modified facility must also be "subject to [BACT]," such that it meets BACT emissions limitations during its operations, *id.* § 7475(a)(4); and the facility's owner or operator must commit to conduct ongoing monitoring, following the plant's modification and during the plant's

37

operation, to determine the effect of its post-modification emissions on air quality, *id.* § 7475(a)(7).

EPA's implementing regulations, which the district court failed to address, make clear that BACT, in particular, is a condition of ongoing operation by mandating that a facility that undergoes a major modification "shall apply" BACT thereafter. 40 C.F.R. § 52.21(j)(3).[8] As the Sixth Circuit has recognized, this language "creates an ongoing obligation to apply BACT." *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410, 418 (6th Cir. 2007).[9]

Thus, until these ongoing PSD requirements are satisfied, the modified plant is in breach of the PSD program, and its continued

---

[8] This regulation is entitled to deference as EPA's reasonable construction of a statute it administers on a question to which Congress has not "directly spoken." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842-43 (1984); *Wheeler v. Heckler,* 787 F.2d 101, 104 (3d Cir. 1986).

[9] The court in *National Parks Conservation Ass'n* separately found that the obligation to obtain a PSD permit was ongoing based on provisions of Tennessee's state implementation plan that incorporated PSD requirements into the state's operating-permit program and required compliance with all applicable emission limitations as a condition of operation. *See* 480 F.3d at 419. Pennsylvania's state implementation plan similarly makes compliance with PSD requirements (referred to in state regulations as "plan approval") part of its operating-permit requirements. *See* 25 Pa. Code § 127.443(a)-(c).

operation "presents a series of discrete violations" each day until it comes into compliance. *Id.* at 417; *see Sierra Club v. Portland Gen. Elec. Co.*, 663 F. Supp. 2d 983 993-94 (D. Or. 2009); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 649-52 (M.D.N.C. 2003), *aff'd on other grounds*, 411 F.3d 539 (4th Cir. 2005), *vacated on other grounds sub nom. Envtl. Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007).

In addition to defying the text, structure, and purpose of the PSD program, the district court's interpretation ignores the established interpretive principle that statutory violations should be construed as "continuing" when the statute's language and purpose show that "'each day's acts bring a renewed threat of the substantive evil Congress sought to prevent.'" *United States v. Edelkind*, 525 F.3d 388, 394 (5th Cir. 2008) (quoting *Toussie v. United States*, 397 U.S. 112, 122 (1970)); *see Postow v. OBA Fed. Sav. & Loan Ass'n*, 627 F.2d 1370, 1379-81 (D.C. Cir. 1980) (holding that disclosure obligations under the Truth-in-Lending Act must be construed as continuing in light of the statute's

remedial goals).[10] Likewise, it furthers the goals of the Clean Air Act to hold power plant owners to a continuing obligation to apply BACT for so long as doing so would reduce the facility's emissions. Each day that the Homer City plant operates without BACT emissions controls brings a renewed threat of the evil the Clean Air Act seeks to prevent. *Edelkind*, 525 F.3d at 394.

---

[10] *See also Edelkind*, 525 F.3d at 394 (federal offense of willful failure to pay child support continues until the last day of the violation because the "statutory language and Congressional intent" show that the offense addresses the ongoing dereliction of support obligations and its "continuing harms"); *cf. United States v. ITT Continental Baking Co.*, 420 U.S. 223, 232 (1975) (construing a consent decree's ban on "acquiring" certain assets to also prohibit retaining them because "[a]ny anticompetitive effect of an acquisition continues as long as the assets obtained are retained"); *Hanover Shoe, Inc. v. United Shoe Machinery Co.*, 392 U.S. 481, 502 n.15 (1968) (deeming timely an antitrust action challenging a business practice that had continued for four decades because the practice "constituted a continuing violation . . . and inflicted continuing and accumulating harm" to the plaintiff).

**2.    The district court incorrectly concluded that the BACT requirement cannot apply unless a PSD permit has been obtained in advance of the modification.**

The district court held that the obligation to comply with the PSD requirements must end once the modification has occurred, if a PSD permit has not been obtained by then. The court reasoned that (1) modification is the only point at which a grandfathered plant can receive a PSD permit, and (2) all the other PSD requirements derive from and depend on the PSD permit. (J.A. 25-26.) But both of the court's premises are incorrect.

First, nothing in the statute bars an owner from obtaining a PSD permit after a modification has occurred if the owner failed to obtain the permit when it was first required to. Belated efforts to comply are better than none at all. Indeed, EPA regulations contemplate that a power-plant owner may obtain a permit after the modification occurs, by requiring an owner who reports to regulators that a proposed modification will not trigger the PSD requirements to monitor its post-modification emissions for five years to confirm the accuracy of its determination. See *supra* at 14-15. And certainly no provision in the

Clean Air Act prevents a federal court from ordering an owner to apply for a PSD permit after a modification has been completed.

Second, even if it were true that a PSD permit could not be obtained after a modification has occurred, that would not defeat the claim for injunctive relief here, because plaintiffs seek an order compelling the plant to comply with the duty to apply BACT, and that obligation derives directly from the statute, not from any PSD permit. Section 7475(a) contains eight independent subparagraphs constituting the requirements of the PSD program. The duty to obtain a permit is just one of those eight requirements. The provision mandating the application of BACT is a stand-alone statutory requirement that does not refer to the PSD permit requirement or depend on the existence of a PSD permit. *See* 42 U.S.C. § 7475(a)(4).[11] The duty to apply BACT therefore stands independently of the obligation to obtain a PSD permit, and a plant owner's failure to obtain a permit when it modifies

---

[11] The obligation to conduct ongoing monitoring of emissions is similarly independent of the permit, applying to any facility "for which a permit *is required*." 42 U.S.C. § 7475(a)(7) (emphasis added); *see New Jersey v. Reliant Energy Mid-Atl. Power Holdings, LLC*, Civ. A. No. 07-cv-5298, 2009 WL 3234438, at *16 (E.D. Pa. Sept. 30, 2009).

a facility in no way excuses the owner from complying with BACT. *See New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 664-65 (W.D.N.Y. 2003) ("*Niagara Mohawk I*"). It would be an odd construction of the statute indeed that would allow an owner's evasion of its duty to obtain a PSD permit to erase its obligation to comply with independent BACT emissions limitations. *See id.* at 663.

The district court said that the obligation to apply BACT must depend on the existence of a PSD permit because BACT limits are merely "hypothetical conditions" in the absence of an individualized determination from the permitting agency through the permitting process. (J.A. 26.) It is true that the permitting process is the usual method by which a facility's specific BACT requirement is determined, because it is expected that facility owners will comply with the Act by seeking a permit when one is required. But it does not follow that an owner's failure to initiate the permitting process that leads to a BACT determination should give the owner a defense against injunctive relief requiring it to apply BACT.

On the contrary, a court can and should order the owner to seek an individualized BACT determination from the permitting agency.

43

Here, of course, the permitting agency is a party and could easily provide its view of the appropriate BACT limitation to the court in this very proceeding. Moreover, it is incorrect to say that BACT is merely "hypothetical" in the absence of an individualized determination. EPA regulations set an outer-limit rate of emissions that constitutes BACT in the absence of any individualized determination for a specific facility. *See* 40 C.F.R. § 60.43Da. The lack of a facility-specific BACT determination, due to an owner's failure to seek a permit, is certainly no reason to excuse a facility from complying with the categorical emissions maximum set by this regulation.

The district court mistakenly concluded that it would be unfair to construe the BACT requirement as an ongoing obligation because the PSD program supposedly has "vague triggering standards" and "reli[es] on the operator to voluntarily apply for a permit and enter the program." (J.A. 21.) The Clean Air Act charges a grandfathered plant's owner with the duty to assess whether a contemplated modification will end the plant's grandfathered status. In some cases, that determination will be an easy one because it will be clear whether the modification will significantly increase emissions. The Homer City plant may well

present just such an easy case, at least with respect to the modifications identified in both the United States' and the States' complaints (*i.e.*, the economizer projects, *see* J.A. 81-82, ¶ 68; J.A. 84-85, ¶ 79; J.A. 114, ¶ 103; J.A. 117, ¶ 122). We do not know at this point, because there has not yet been any discovery. In the procedural posture of this case, there is no reason to assume that a close question was presented by each of the modifications made by the former owners to the Homer City plant.

Moreover, when there is genuine uncertainty as to whether a change constitutes a major modification that will result in the loss of grandfathered status, the owner may reduce any risk of error by asking EPA or a state environmental agency for advance guidance on the question. *Cf. WEPCO*, 893 F.2d at 906. The owners of the Homer City plant failed to ask for such guidance.[12]

It may be that the guidance process will not eliminate all doubts, in every case, as to whether the changes will result in loss of

---

[12] The five-year monitoring requirement that arises when an owner determines that a modification will not significantly increase emissions, see *supra* at 14-15, also reduces potential uncertainty as to whether a modification ends a plant's grandfathered status and triggers the PSD requirements.

grandfathered status. But when a plant owner perceives that a proposed modification presents a close call, that owner, not the public, must ultimately bear the consequences if it goes forward with the modification without complying with the requirements of the PSD program. The public should not be exposed to the harms of serious air pollution simply because the owner of a power plant may face some uncertainty about the effects of modifications that it has decided to make to its own facility. An owner that perceives such uncertainty and is unable for some reason to resolve it has options available to avoid risking an enforcement action later: the owner may choose to err, if at all, on the side of complying with the PSD requirements, or the owner may decline to pursue the modification altogether.

The district court said that the PSD program to a degree leaves "the proverbial fox to guard the henhouse" (J.A. 19), but it is common for regulatory programs to rely in the first instance on voluntary compliance. The court failed to recognize that such programs work only if strong enforcement remedies are available to ensure that regulated parties are not tempted to take the risk of failing to comply. The court undermined the basic structure of the PSD program in holding that a

plant owner's decision to ignore the PSD permitting requirement when it undertakes a modification may eradicate any ongoing obligation to comply with BACT.

### 3. The buyer of a power plant is well positioned to discover that the plant previously underwent a major modification.

The district court seemed especially troubled that the Homer City plant's current owners had purchased the plant after the modification occurred. The court suggested that its ruling that the only violation of the PSD program occurs at the moment of modification might perhaps be limited to cases where "facilities . . . have changed ownership." (J.A. 22-23.) The court seemingly left room for the possibility that a different rule might apply where there had been no change in ownership. But nothing in the text or purpose of the PSD statute or its implementing regulations supports a different rule as to whether a violation is one-time or continuing based on whether a plant has changed ownership following a modification. Nor is there any practical reason to adopt a different rule based on whether a change of ownership has occurred.

The court's explanation for its ruling emphasized a perceived unfairness in a rule that would award an injunction against the current

owners of the Homer City plant, whom it deemed on the face of the pleadings to be blameless. (J.A. 21.) But the current owners, when they purchased the Homer City plant, were well positioned to determine whether any past modification of the plant had triggered the requirements of the PSD program and to remedy the plant's noncompliance with the program. A major power plant costs hundreds of millions or billions of dollars; a purchaser is necessarily a highly sophisticated party that knows, or should know, that the operations of such a facility are highly regulated and is familiar, or should be familiar, with the details of the regulatory schemes that apply.

The sale of a power plant presents an opportunity for a new evaluation by the buyer as to whether the plant's grandfathered status remains in place: the purchaser has available for review the record of the plant's actual post-modification emissions, which the former owners are required by state law to maintain. *See* 25 Pa. Code § 135.3; *see also* 35 P.S. § 4013.2 (emission data is not confidential). The Homer City buyers were able to review those emissions records as well as detailed maintenance records of work done on the generating units before buying the plant. Purchasers can and should inquire as to whether

major modifications to a plant were previously made and, if they were, should adjust their offer to buy the plant based on the fact that they would have to bring the plant into compliance on a going-forward basis. The statutory purpose would be undermined by a rule absolving purchasers of any duty to look into whether the plant was previously modified, as well as any duty to comply with the PSD program if such a past modification did occur.

Even if detection at the time of sale were difficult, fairness would not require protecting highly sophisticated parties from liability at the expense of the public health and the environment. In this case, the buyers could reasonably be expected to have recognized and protected against the risk that the facility had undergone a major modification that triggered the PSD requirements, given that they were acquiring a very old facility with two grandfathered generating units that lacked pollution controls for sulfur dioxide. The Homer City buyers had various options at their disposal to limit their risk; they could have contracted for representations and warranties or indemnification rights from the seller or negotiated a reduced purchase price reflecting the risks they were assuming. Discovery may well reveal that the Homer City buyers

indeed employed one or more of these options, which are common in commercial transactions.

Most courts to confront the question have rejected the premise that the sale of a power plant immunizes the plant from the Clean Air Act's emissions requirements. In five other cases courts have considered the obligation to apply BACT of an owner who acquired a previously grandfathered plant after a modification. In four of those cases, the courts held that the purchaser could be required to apply BACT. *See United States v. La. Generating, LLC*, No. 09-100-JJB, 2011 WL 6012997, at *12 (M.D. La., Dec. 1, 2011); *Reliant Energy*, 2009 WL 3234438, at *16; *United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 959 (S.D. Ill. 2003); *New York v. Niagara Mohawk Power Corp.*, No. 02-cv-24S, 2003 WL 23356447, at *3 (W.D.N.Y. Dec. 31, 2003) ("*Niagara Mohawk II*").[13] Only one court endorsed the outcome reached by the court below. *See United States v. Midwest Generation, LLC*, 781 F.

---

[13] The courts differed somewhat on the appropriate enforcement mechanism, but not on the principle that a purchaser can be enjoined to apply BACT. *See La. Generating*, 2011 WL 6012997, at *10-15 (PSD and Title V); *Reliant Energy*, 2009 WL 3234438, at *14-16 (PSD); *Ill. Power*, 245 F. Supp. 2d at 959 (Illinois SIP); and *Niagara Mohawk II*, 2003 WL 23356447, at *3 (Title V).

Supp. 2d 677, 684-86 (N.D. Ill. 2011); *United States v. Midwest Generation, LLC*, 694 F. Supp. 2d 999, 1007 (N.D. Ill. 2010). That court made no attempt to reconcile its ruling with the PSD program's fundamental goals.

**B.    The Former Owners of a Plant That Was Modified During Their Ownership May be Subject to an Injunction Requiring Them To Mitigate the Harms from Their Past Violations.**

Even if the Homer City plant's *current* owners were not presently violating the Clean Air Act (and they are), the *former* owners would be responsible for past violations that continue to harm the public health and the environment each day that the plant operates without BACT emissions limitations. The district court dismissed the States' claims for injunctive relief against the former owners based on the erroneous premise that, as a matter of law, an injunction is available only "to prevent future violations" (J.A. 29), not to redress past violations.

There is no such categorical limitation on the courts' broad equitable powers: "a court's equitable power to enforce a statute includes the power to provide remedies for past violations." *U.S. Pub. Interest Research Group v. Atl. Salmon of Maine, LLC*, 339 F.3d 23, 31

(1st Cir. 2003).[14] This Court has recognized that federal courts have broad power to "fashion any remedy deemed necessary and appropriate to do justice in the particular case." *United States v. Price*, 688 F.2d 204, 211 (3d Cir. 1982). In proceedings involving the public interest, the court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

A court may exercise the "full scope" of its equitable powers to remedy a statutory violation, unless the statute, "in so many words, or by a necessary and inescapable inference," restricts the use of those powers. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)

---

[14] The district court relied on two decisions of the Supreme Court, but neither one supports a categorical bar on injunctive relief to remedy past violations. (J.A. 30-31.) To the contrary, in *Steel Co. v. Citizens for a Better Environment*, the Court presumed that injunctive relief would be available to redress a past statutory violation where the resulting harm is ongoing; the Court noted that in the case at bar the injunction the plaintiffs sought could not "conceivably remedy any past wrong," and asked whether injunctive relief would prevent a "continuing violation or the imminence of a future violation," in order to resolve a question of the plaintiffs' standing. 523 U.S. 83, 108 (1998). And in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, the Court was not even addressing the equitable remedies available for violations of environmental statutes, but rather, the scope of the citizen-suit provision. 484 U.S. 49, 66-67 (1987).

(quotation marks omitted). The authorization to enforce emission standards and limitations in the Clean Air Act's citizen-suit provision, 42 U.S.C. § 7604(a), imposes no such restriction on the courts' equitable powers, *see Niagara Mohawk I*, 263 F. Supp. 2d at 658-60, 663-65 (upholding claims for injunctive relief brought under citizen-suit provision against a power plant's former owners). Therefore, the citizen-suit provision falls under the rule that "when a statutory provision gives the courts power to 'enforce prohibitions' contained in a regulation or statute, Congress will be deemed to have granted as much equitable authority as is necessary to further the underlying purposes and policies of the statute." *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 225 (3d Cir. 2005).

Thus, an order directing the former owners to take steps to mitigate harm from their many years of excess air pollution is well within the scope of the district court's inherent equitable powers and its statutory authority to enforce the Clean Air Act's emissions standards. Similar or even more extensive remedial relief has been awarded under the Act and other environmental statutes. *See Lane Labs-USA*, 427 F.3d at 230 (requiring restitution for violations of the Food, Drug, and

Cosmetic Act); *U.S. Pub. Interest Research Group*, 339 F.3d at 31 (requiring remedial measures for harm caused by past statutory violations of the Clean Water Act); *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1057-66 (S.D. Ind. 2008) (order to remedy environmental effects of PSD violations).[15]

Nor was there cause to dismiss the States' claim for injunctive relief against the plant's former owners as a matter of law on the ground that such relief would be "novel," as the district court claimed. (J.A. 29.) Equitable remedies are flexible, and a court may "mould each decree to the necessities of the particular case." *Weinberger*, 456 U.S. at 312. An injunction requiring the former owners to remedy the effects of their past violations would suit the necessities of this case, because each day that the plant operates without such emissions controls, it causes irreparable harm to the public health and the environment in the States. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)

---

[15] For the same reasons, the plant's current owners can be ordered to remedy the harm caused by their failure to apply BACT since they took ownership of the plant. (*See* J.A. 129.)

("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often . . . irreparable.").

The States' request for an injunction against the former owners should not have been dismissed as a matter of law, on the face of the complaint. The States should have been given the opportunity to demonstrate, on a full record, that equitable relief is appropriate and feasible. There are a number of ways in which the former owners could be required to mitigate the harm they have caused. The most direct way would be to require them to install emissions controls on Units 1 and 2, which would enable the plant to meet BACT levels for sulfur dioxide emissions from those units. Assuming, however, that the current owners follow through with the installation of scrubbers on those generating units, see *supra* note 2, the former owners could be ordered to purchase and "retire" emissions allowances, thereby reducing the amount of sulfur dioxide that other facilities can emit (*see* J.A. 128-129). The former owners could also be enjoined to take measures to restore natural resources downwind of the plant that have been damaged by acid rain. In short, the district court should not have ruled on the States' claims for injunctive relief against the former owners without

holding an evidentiary hearing and weighing whether to impose equitable relief and how to design an equitable remedy.

Nor does the governments' supposed delay in bringing the action provide a basis to dismiss the States' claims for injunctive relief against the former owners as a matter of law. (J.A. 31.) The district court did not expressly invoke any concept of laches in dismissing the complaint. And in any event, laches is disfavored in environmental litigation seeking "vindication of congressional policies aimed at benefitting the public," because "the public at large will suffer when meritorious environmental challenges are foreclosed." *Shiffler v. Schlesinger*, 548 F.2d 96, 103 (3d Cir. 1977). That principle applies strongly here, because the States seek to remedy ongoing harm to the public health and the environment. *See United States v. Am. Elec. Power Serv. Corp.*, 136 F. Supp. 2d 808, 811 (S.D. Ohio 2001) (recognizing that the principle disfavoring laches in environmental cases applies to actions by states under the citizen-suit provision to address PSD violations).[16]

---

[16] Moreover, the States, as plaintiffs, were not required to plead facts refuting the affirmative defense of laches in anticipation that the defendants might raise it. *Williams v. Runyon*, 130 F.3d 568, 573 (3d

(continued on the next page)

\*　　\*　　\*

In sum, injunctive relief is available, on a proper factual showing, against both the current and former owners of the Homer City plant to protect the public from the ongoing harms resulting from the major modifications of the plant that ended its grandfathered status and subjected it to the requirements of the PSD program. The district court's contrary decision should be reversed.

## POINT II

### THE STATES' CLAIMS FOR CIVIL PENALTIES UNDER THE PSD PROGRAM WERE NOT TIME-BARRED

The district court held that the claims for civil penalties against the Homer City plant's current owners under the PSD program were untimely under the five-year statute of limitations on penalties. 28 U.S.C. § 2462. (J.A. 26.) This ruling rested on the court's determination that the only violation of the PSD program occurred at the moment the

Cir. 1997); *see Goodman v. Praxair, Inc.*, 494 F.3d 458, 465-66 (4th Cir. 2007); *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). The question whether the former owners may prevail on a laches defense must be decided on a full record, not on the basis of the pleadings.

plant was modified without complying with the requirements of the program. Like its ruling denying injunctive relief, the court's rejection of the claims for civil penalties would undermine an important tool to enforce the requirements of the Clean Air Act.

As explained in Point I, *supra*, the court's ruling was mistaken. Because the statute, read properly, imposes a continuing obligation to comply, a "cause of action manifests itself anew," and a new statute of limitations accrues, "each day a plant operates without BACT limits on emissions." *Nat'l Parks Conservation Ass'n*, 480 F.3d at 419; *see United States v. Chevron, U.S.A., Inc.*, 639 F. Supp. 770, 779 (W.D. Tex. 1985) (assessing over $4.5 million in civil penalties where refinery failed to obtain a PSD permit and "operated 522 days with excessive sulfur dioxide emissions"); *cf.* 35 P.S. § 4009.3 (each day of continued violation of the Pennsylvania Air Pollution Control Act or any regulation adopted under it is a separate offense and violation). The States' claims for penalties were therefore timely.

The district court's interpretation of the statute of limitations for civil penalties further distorts the Clean Air Act's incentive structure beyond the damage done by the court's rejection of injunctive relief. The

threat of civil penalties promotes the PSD program's express purpose of "ensur[ing] that any decision to permit increased air pollution . . . is made only after careful evaluation of the consequences." 42 U.S.C. § 7470(5). The district court's construction of the statute, under which an owner escapes civil penalties altogether if its unpermitted modification avoids detection by environmental agencies for more than five years, offers owners the possibility of avoiding the costs of applying BACT at old, heavily polluting plants if they avoid detection until the statute of limitations has run. Under the district court's reading, there would be little disincentive to taking this risk: in the event that the violation *is* detected within the limitations period, the sanction for the one-time violation would be trivial: a single day of civil penalties capped at $37,500. *See* 40 C.F.R. § 19.4. The maximum penalty amount would be insignificant to the owner of a multibillion-dollar power plant. Congress plainly did not intend to create a nominal penalty with no deterrent effect. *See* H.R. Rep. No. 95-294, *supra*, at 71  (stating that civil penalties will encourage plant owners "to implement measures that will insure violations will not occur").

The court's interpretation of the statute would also have the implausible effect of making the penalties for partial compliance with the PSD program far greater than the penalties for ignoring the program altogether. An owner who obtained a PSD permit, but failed to follow all of its conditions, would accumulate increasing penalty exposure for each day of noncompliance with any condition. *See* 42 U.S.C. § 7413(b). By contrast, an owner who ignored the permit requirement altogether would be exposed to only a single day of penalties for failing to seek the permit. Thus, an owner who "actually follows the mandates of the Act, obtains a PSD permit and determines [BACT] for its facility, but then fails to implement or meet emission limitations would be subjected to greater enforcement liability than an owner or operator who ignores the PSD requirements." *Dairyland Power Coop.*, 2010 WL 4294622, at *15. The district court's reading of the statute is irrational in this further respect.

Moreover, the staleness concern that generally animates statutes of limitations does not support the conclusion that the claim is time-barred here. The Homer City plant remains out of compliance with emissions limitations and is causing continuing harm to the public

health and the environment. As the Supreme Court has observed, "[w]here the challenged violation is a continuing one, the staleness concern disappears." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) (holding that claims under the Fair Housing Act challenging "an unlawful practice that continues into the limitations period" are all timely if filed "within 180 days of the last asserted occurrence of that practice").

In any event, although the court invoked the statute of limitations to dismiss the claims for civil penalties, its reasoning would preclude the imposition of civil penalties against the purchaser of a noncompliant power plant no matter when the claims were brought. The court concluded that it would be unfair to construe the Act to permit imposition of civil penalties against the current owners in this case because they bought the plant after the modifications occurred. (*See* J.A. 21.) As explained above, however, the Homer City plant's current owners were well-positioned to recognize and resolve the plant's statutory violations when they acquired the plant, but they did not do so. They also had means readily available to limit their risk of legal exposure if any undisclosed past modifications of the plant were

discovered later. A rule precluding the imposition of civil penalties against the purchasers of a grandfathered plant that underwent a modification before they purchased it would undermine "the role of civil penalties as a deterrent." *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1160 (9th Cir. 2002). The rule would give purchasers every incentive to take the chance that a violation will remain undetected, since the only consequence of detection could be that the purchaser would be required then to bring the plant into compliance. And, of course, the district court's ruling on the claims for injunctive relief removes that potential consequence as well.

Even if the district court were correct in its view that imposing penalties on the new owners in this case might be unfair, which it is not, that concern would be no reason to conclude that failure to comply with the PSD program is a one-time violation rather than a continuing violation. The Clean Air Act provides ample opportunity for a court to consider fairness concerns at the remedy stage in determining the amount of penalties to be imposed in a particular case. 42 U.S.C. § 7413(e)(1); *see United States v. Anthony Dell'Aquilla Enters.*, 150 F.3d 329, 337-39 (3d Cir. 1998). Case-specific concerns about fairness should

not drive the analysis of the general question whether noncompliance with the PSD program is a violation that occurs only at the moment a modification is undertaken or continues thereafter during a modified facility's operations. That question is presented in a broad range of cases, including many involving clearly willful violations— either by the original owner or by subsequent owners.

**POINT III**

## THE DISTRICT COURT INCORRECTLY DISMISSED THE STATES' TITLE V CLAIMS AS A MATTER OF LAW

The district court also erred in dismissing the States' Title V claims as a matter of law. The complaint alleges that the Homer City plant's current owners are violating the requirements of the Title V operating-permit program in two ways: (1) by operating the Homer City plant with a Title V permit that lacks a BACT emission limitation for the two modified units, and (2) by violating the condition of their Title V permit that authorizes the operation of those units only in unmodified form. These violations are actionable independently of the States'

63

claims under the PSD program under the Act's citizen-suit provision. *See* 42 U.S.C. § 7604(a)(1), (f)(4).

### A. The Title V Permit Is Deficient Because It Fails To Include a BACT Emission Limitation for Each of the Modified Units.

Major sources like the Homer City plant must have a Title V permit that specifies "enforceable emission limitations." 42 U.S.C. § 7661c(a); *see* 25 Pa. Code § 127.502. BACT is one of those limitations. *See* 42 U.S.C. § 7479(3). Because the Homer City plant does not have a PSD permit authorizing the modifications to Units 1 and 2, its Title V permit does not incorporate a condition that would require it to apply a BACT emission limitation for sulfur dioxide from the two modified units. (J.A. 122-123, ¶¶ 151-153; J.A. 218-219, ¶¶ 109-111.) The plant's current owners have failed to remedy this deficiency either by applying for a PSD permit or by seeking to amend their operating permit to incorporate this applicable requirement. (J.A. 122-125, ¶ 153, ¶¶ 156-160; J.A. 219-221, ¶ 111, ¶¶ 114-118.) As explained more fully in the United States' brief, the owner of a modified facility, even one that purchased the facility after issuance of the Title V permit, can be liable for operating with a Title V permit that lacks a BACT requirement. *See,*

64

*e.g.*, *La. Generating*, 2011 WL 6012997, at *12-14; *Niagara Mohawk II*, 2003 WL 23356447, at *2-3. The States have adequately alleged such a claim here.

### B. The Plant's Owners Are Violating the Title V Operating Permit by Operating the Plant with Modifications Not Authorized in the Permit.

The district court misconstrued a separate ground for the States' Title V claim, asserting that the States "have not alleged any affirmative condition in the Title V permit which is being violated." (J.A. 34.) In addition to alleging that the plant's current owners are operating with a deficient Title V permit, the States plainly allege that the owners are violating the condition of their Title V permit that authorizes operation of Units 1 and 2 only as *unmodified* units. (J.A. 123, ¶ 154.)

The Act prohibits operation of a major source in violation of a Title V operating permit. *See* 42 U.S.C. § 7661a(a). Here, the Title V permit allows operation of the Homer City plant only in accordance with the physical configurations and design details submitted with the plan-approval and operating-permit applications. (J.A. 96-97, ¶ 24; J.A. 123, ¶¶ 154-155; J.A. 201, ¶ 23.) Because the information provided in the

65

Title V permit applications reflected that the physical configuration of Units 1 and 2 had not changed for purposes of PSD applicability since those units were built, the permit authorizes operation of these two units only as unmodified units.[17] (J.A. 122-123, ¶¶ 152, 154.)

Although the Title V permit application was submitted by the plant's former owners, its current owners purchased the plant in 1999, while the application remained pending. (J.A. 80, ¶¶ 61-63.) Therefore, the plant's current owners had a legal duty to correct any mistaken or incomplete information in the permit application. *See* 25 Pa. Code § 127.414(b). Accordingly, even if the district court had properly dismissed the PSD claims against the current owners, and it did not, the States' complaints would nonetheless state claims against those defendants for violations of the condition in the Title V permit that authorizes operation of Units 1 and 2 as unmodified units. 42 U.S.C.

---

[17] Because each of the modifications alleged here is a "physical change" that resulted in an emissions increase, 42 U.S.C. § 7411(a)(4), the modification of the units changed their physical configurations from what was specified in the Title V application. (J.A. 123-125, ¶¶ 154-160.)

§ 7661a(a); *id.* § 7604(a)(1), (f)(4); *see Niagara Mohawk II*, 2003 WL 23356447, at *2.

## POINT IV

### THE DISTRICT COURT WRONGLY DISMISSED THE CLAIMS UNDER PENNSYLVANIA LAW AS A MATTER OF LAW

The district court correctly recognized that PaDEP's claim under the state Air Pollution Control Act essentially tracks the federal claims, but it erred in dismissing the state-law claim for the same reasons that it erred in dismissing the federal claims. Pennsylvania's federally enforceable state implementation plan incorporates EPA's PSD regulations by reference, 40 C.F.R. § 52.2058; 25 Pa. Code §§ 127.81-.83, and also includes Pennsylvania's plan-approval and operating-permit regulations. Moreover, each day of continued violation of the Air Pollution Control Act or any regulation adopted under it is a separate offense and violation. 35 P.S. § 4009.3. Therefore, the discussion above demonstrating that the district court erred in interpreting the federal PSD and Title V requirements likewise applies to the district court's

dismissal of Pennsylvania's state-law statutory claim. Accordingly, the state claim should also be reinstated.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

Dated:  New York, NY
        November 14, 2012

Respectfully submitted,

DAVID J. RAPHAEL
  *Chief Counsel, Commonwealth*
  *of Pennsylvania Department of*
  *Environmental Protection*

ERIC T. SCHNEIDERMAN
  *Attorney General*
  *State of New York*
  Attorney pro se

By:  /s/ Michael J. Heilman
     MICHAEL J. HEILMAN
     Assistant Regional Counsel

By:  /s/ Claude S. Platton
     MICHAEL J. MYERS
     CLAUDE S. PLATTON

MICHAEL J. HEILMAN
Southwest Regional Office
400 Waterfront Drive
Pittsburgh, PA 15222
(412) 442-4262

120 Broadway, 25th Floor
New York, NY 10271
(212) 416-6511

BARBARA D. UNDERWOOD
  *Solicitor General*
RICHARD DEARING
  *Deputy Solicitor General*
CLAUDE S. PLATTON
  *Assistant Solicitor General*
MICHAEL J. MYERS
  *Assistant Attorney General*
    *of Counsel*

ROBERT A. REILEY
Assistant Counsel
400 Market Street
Harrisburg, PA 17105
(717) 787-0478

*(counsel listing continues on next page)*

68

JEFFREY CHIESA
   *Attorney General*
   *State of New Jersey*

By:  /s/ Jon C. Martin
   JON C. MARTIN
   LISA J. MORELLI
   JUNG W. KIM
   Deputy Attorneys General

   Division of Law
   25 Market Street
   Trenton, NJ 08625
   (609) 633-8713

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Claude S. Platton, an attorney in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,297 words and complies with the type-volume limitations of Rule 32(a)(7)(B).

  /s/ Claude S. Platton  
Claude S. Platton

## CERTIFICATE OF ADMISSION

Pursuant to LAR 28.3(d), Claude S. Platton, an attorney in the Office of the Attorney General of the State of New York, hereby certifies that Michael J. Myers is a member of the bar of this Court

  /s/ Claude S. Platton  
Claude S. Platton

## CERTIFICATE OF DIGITAL SUBMISSION

Pursuant to LAR 31.1(c), Claude S. Platton, an attorney in the Office of the Attorney General of the State of New York, hereby certifies that the text of the electronic brief filed in the Court's ECF system is identical to the text in the paper copies. Counsel further certifies that McAfee VirusScan Enterprise ver. 8.7*i* (last updated November 14, 2012) was run on the electronic file and that no virus was detected.

  /s/ Claude S. Platton  
Claude S. Platton

# TABLE OF CONTENTS TO THE JOINT APPENDIX

## VOLUME I

| # | __Document Description__ | __JA No.__ |
|---|---|---|
| 1 | Notice of Appeal, filed by U.S. (Dkt. No. 112) | 1 |
| 2 | Notice of Appeal, filed by NY (Dkt. No. 113) | 3 |
| 3 | Notice of Appeal, filed by PA and NJ (Dkt. No. 114) | 4 |
| 4 | Memorandum Opinion and Order of the Court (Dkt. No. 111) | 6 |

## VOLUME II

| | | |
|---|---|---|
| 5 | Civil Docket for Case #: 2:11-cv-00019-TFM | 47 |
| 6 | Complaint, filed by U.S. (Dkt. No. 1) | 65 |
| 7 | Intervenor Complaint, filed by PA and NY (Dkt. No. 10) | 91 |
| 8 | Brief in Support of Motion to Dismiss Ex. A – 40 C.F.R. § 52.21, Prevention of significant deterioration of air quality (Dkt. No. 86-1) | 131 |
| 9 | Brief in Support of Motion to Dismiss Ex. C – Guidance for Application of Regional Civil Assessment Procedure, Revised Draft, Sept. 21, 2002 (Dkt. No. 86-3) | 154 |
| 10 | Brief in Support of Motion to Dismiss Ex. D – Guidance for Application of Regional Civil Assessment Procedure, Final Draft, Oct. 30, 2010 (Dkt. No. 86-4) | 175 |
| 11 | Amended Intervenor Complaint, filed by NJ (Dkt. No. 96) | 195 |
| 12 | Opposition to Defendants' Motions to Dismiss Ex. 1 – 19 Pa. Bull. No. 11, Mar. 18, 1989 (Dkt. No. 99-2) | 224 |

# UNITED STATES DISTRICT COURT
for the
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW YORK, AND STATE OF NEW JERSEY | ) ) ) ) ) | |
| Plaintiffs | ) ) | Case No. 2:11-CV-19 |
| v. | ) ) | |
| EME HOMER CITY GENERATION L.P., HOMER CITY OL1 LLC, HOMER CITY OL2 LLC, HOMER CITY OL3 LLC, HOMER CITY OL4 LLC, HOMER CITY OL5 LLC, HOMER CITY OL6 LLC, HOMER CITY OL7 LLC, HOMER CITY OL8 LLC, NEW YORK STATE ELECTRIC AND GAS CORPORATION and PENNSYLVANIA ELECTRIC COMPANY, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants | | |

## NOTICE OF APPEAL

Notice is hereby given that the United States of America, plaintiff in the above named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered in this action on October 12, 2011.

Date: December 8, 2011

Respectfully Submitted,

ROBERT DREHER
Acting Assistant Attorney General
Environment & Natural Resources Division

/s/ *Katherine L. Vanderhook-Gomez*
JOHN W. SITHER
CARA M. MROCZEK
KATHERINE L. VANDERHOOK-GOMEZ
(NY Bar # 4148060)
Environmental Enforcement Section
P.O. Box 7611

**JA 001**

Washington, DC 20044-7611
katherine.vanderhook-gomez@usdoj.gov
202-514-3900


DAVID J. HICKTON
United States Attorney
Western District of Pennsylvania

PAUL SKIRTICH
Assistant United States Attorney
Western District of Pennsylvania
United States Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219

# UNITED STATES DISTRICT COURT

for the
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, COMMONWEALTH OF PENNSYLVANIA, STATE OF NEW YORK, AND STATE OF NEW JERSEY,<br><br>Plaintiffs<br><br>v.<br><br>EME HOMER CITY GENERATION L.P., HOMER CITY OL1 LLC, HOMER CITY OL2 LLC, HOMER CITY OL3 LLC, HOMER CITY OL4 LLC, HOMER CITY OL5 LLC, HOMER CITY OL6 LLC, HOMER CITY OL7 LLC, HOMER CITY OL8 LLC, NEW YORK STATE ELECTRIC AND GAS CORPORATION and PENNSYLVANIA ELECTRIC COMPANY,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 2:11-CV-19 |

## NOTICE OF APPEAL

Notice is hereby given that the State of New York, plaintiff-intervenor in the above named case, hereby appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered in this action on October 12, 2011.

Date:  December 9, 2011

Respectfully Submitted,

ERIC T. SCHNEIDERMAN
Attorney General

_/s/  Susan C. von Reusner_

MICHAEL J. MYERS
SUSAN C. VON REUSNER
Assistant Attorneys General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
michael.myers@ag.ny.gov
(518) 402-2594

**JA 003**

# UNITED STATES DISTRICT COURT
for the
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF ENVIRONMENTAL PROTECTION, STATE OF NEW YORK and STATE OF NEW JERSEY, | ) ) ) ) ) | |
| | ) | Case No. 2:11- CV-19 |
| Plaintiffs | ) ) | |
| v. | ) ) | |
| EME HOMER CITY GENERATION L.P., HOMER CITY OL1 LLC, HOMER CITY OL2 LLC, HOMER CITY OL3 LLC, HOMER CITY OL4 LLC, HOMER CITY OL5 LLC, HOMER CITY OL6 LLC, HOMER CITY OL7 LLC, HOMER CITY OL8 LLC, NEW YORK STATE ELECTRIC AND GAS CORPORATION and PENNSYLVANIA ELECTRIC COMPANY, | ) ) ) ) ) ) ) ) ) ) | |

Defendants

## NOTICE OF APPEAL

Notice is hereby given that the Commonwealth of Pennsylvania, Department of Environmental Protection, and the State of New Jersey, plaintiffs in the above named case, hereby appeal to the United States Court of Appeals for the Third Circuit from the final judgment entered in this action on October 12, 2011.

Date: December 9, 2011

Respectfully submitted,

DAVID J. RAPHAEL
CHIEF COUNSEL
COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL
PROTECTION

By:

/s/ Michael J. Heilman

Michael J. Heilman, Esquire
Assistant Regional Counsel

**JA 004**

Attorney for the Commonwealth of Pennsylvania,
Department of Environmental Protection
PA ID No. 44223
Office of Chief Counsel
400 Waterfront Drive
Pittsburgh, PA 15222-4745
mheilman@pa.gov
(412)442-4262


PAULA T. DOW
ATTORNEY GENERAL
STATE OF NEW JERSEY

By:

/s/ Lisa Morelli

Lisa Morelli, Esquire
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, NJ 08625
lisa.morelli@dol.lps.state.nj.us
(609)633-8109

JA 005

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,                    )
                                             )
               Plaintiff,                    )
                                             )    2:11-cv-19
        v.                                   )
                                             )    **MEMORANDUM OPINION**
EME HOMER CITY GENERATION L.P.,              )    **AND ORDER OF COURT**
HOMER CITY OL1 LLC,  HOMER CITY OL2          )
LLC, HOMER CITY OL3 OLC, HOMER CITY          )
OL4 LLC, HOMER CITY OL5 LLC, HOMER           )
CITY OL6 LLC, HOMER CITY OL7, HOMER          )
CITY OL8, NEW YORK STATE ELECTRIC            )
AND GAS CORPORATION and                      )
PENNSYLVANIA ELECTRIC COMPANY,               )
                                             )
               Defendants.                   )
                                             )
_____      )
                                             )
COMMONWEALTH OF PENNSYLVANIA,                )
DEPARTMENT OF ENVIRONMENTAL                   )
PROTECTION and STATE OF NEW YORK,            )
                                             )
               Intervenor-Plaintiffs,        )
        v.                                   )
EME HOMER CITY GENERATION L.P., et al.       )
                                             )
               Defendants.                   )
                                             )
_____      )
                                             )
STATE OF NEW JERSEY,                         )
                                             )
               Intervenor-Plaintiff,         )
        v.                                   )
EME HOMER CITY GENERATION L.P., et al.       )
                                             )
               Defendants.                   )
                                             )
                                             )

JA 006

## <u>MEMORANDUM OPINION AND ORDER OF COURT</u>

Pending before the Court are the following motions to dismiss: EME HOMER CITY

GENERATION L.P.'S MOTION TO DISMISS (Doc. No. 85); DEFENDANTS HOMER CITY

OWNER-LESSORS' MOTION TO DISMISS (Doc. No. 87); NEW YORK STATE ELECTRIC

& GAS CORPORATION'S MOTION TO DISMISS (Doc. No. 88); and PENNSYLVANIA

ELECTRIC COMPANY'S MOTION TO DISMISS (Doc. No. 91), each with a brief in support.

Plaintiff United States of America and three intervenor Plaintiffs, Commonwealth of

Pennsylvania Department of Environmental Protection ("PADEP"), State of New York and State

of New Jersey (collectively the "Intervenors"), filed briefs in opposition. All Defendants filed

reply briefs. The issues have been fully briefed and are ripe for disposition.


### Factual Background

This case involves alleged violations of the federal Clean Air Act, 42 U.S.C. § 7470 et

seq., at the Homer City coal-fired power plant in Indiana County, Pennsylvania (the "Plant").

Although the legal issues raised in this case are complex, the facts pled in the three separate

Complaints filed by the United States and the Intervenor state Plaintiffs are relatively straight-

forward.

Defendant New York State Electric and Gas Corporation ("NYSEC") was an owner of

the Plant from January 1968 until June 1998. Defendant Pennsylvania Electric Company

("PENELEC") was an owner of the Plant from January 1968 until March 1999 and also operated

the Plant during this same timeframe.[1] Defendant EME Homer City Generation, L.P. ("EME")

owned the Plant from March 1999 until December 7, 2001 and has operated the Plant from

March 1999 through the present. In 2001, EME and the eight Homer City Owner-Lessor

---

[1] The intervenor complaints allege that NYSEC and PENELEC began construction of the Plant in 1965.

**JA 007**

Limited Liability Companies (the "OLs") completed a sale-leaseback transaction, by which the OLs acquired ownership of the Plant. For clarity and convenience, NYSEC and PENELEC will be referred to as the "Former Owners" and EME and the OLs will be referred to as the "Current Owners."

The Plant has three coal-fired generating units. Units 1 and 2 began operating in 1969, prior to the enactment of the provisions of the Clean Air Act at issue, and neither unit has been retrofitted with a wet flue gas desulfurization scrubber to control SO2 emissions which adversely impact human health and the environment, including asthma and acid rain. In 2009, Units 1 and 2 emitted approximately 96,000 tons of SO2, amongst the highest in the nation.[2] All three boiler units are currently equipped with electro-static precipitators for particulate control and selective catalytic reduction for control of nitrogen oxides ("NOx").

In August 1991, the Former Owners commenced a multi-million dollar project to replace the economizer on Unit 2, which included modification of the backpass gas ductwork and installation of new reheat temperature control dampers and internal boiler supports and related work. In March 1994, the Former Owners commenced a similar project to replace the economizer on Unit 1. In 1995 and 1996, the Former Owners replaced the vertical reheater pendants on Units 1 and 2.[3] The Former Owners did not apply for or obtain a permit under the Prevention of Significant Deterioration ("PSD") program of the Clean Air Act before performing any of these projects.

On August 3, 1995, PENELEC submitted an application for an operating permit for the Plant pursuant to the requirements of Title V of the Clean Air Act. On January 30, 2004, PADEP issued a final Title V permit for the Plant. The effective date of the permit was

---

[2] Unit 3, which is not at issue in this case, began operation in 1977 and is equipped with a scrubber.
[3] The Intervenors, but not the United States, contend that the vertical reheater pendant projects violated the PSD program.

December 1, 2004. United States Complaint ¶ 61. The Intervenors allege that PADEP issued several operating permits for the emission sources at the Plant, the most recent of which is Title V permit No. 32-00055, issued on January 2004, with an amendment effective on December 1, 2004. PADEP/New York Complaint ¶ 23; New Jersey Complaint ¶ 22. The actual Title V permit was not attached to the Complaints or otherwise provided to the Court. It is unclear whether concerns regarding the projects at issue were raised during the ten year period when the Title V permit application was under review by regulators.

For many years, environmental regulators took no action to challenge the 1991, 1994, 1995 or 1996 projects as improper. On June 12, 2008, the United States Environmental Protection Agency ("EPA") issued a Notice and Finding of Violation ("NOV") to the Current Owners. On May 6, 2010 and November 1, 2010, the EPA issued subsequent NOVs to all of the named Defendants. Plaintiffs allege that Defendants undertook the 1991, 1994, 1995 and 1996 projects without having obtained the requisite PSD permits. In addition, Plaintiffs allege that because the projects should have triggered a requirement to install the Best Available Control Technology ("BACT") to control emissions of sulfur dioxide ("$SO2$") and/or particulate matter, Defendants failed to submit a complete application for a Title V operating permit, and thus failed to obtain a proper or valid Title V operating permit.

The United States initiated this action on January 6, 2011, with the filing of a four-count civil complaint against all of the named Defendants. Counts 1 and 3 allege violations by all Defendants of the PSD provisions of the Clean Air Act, 42 U.S.C. §§ 7470-7492, and the federally-approved Pennsylvania State Implementation Plan ("SIP"), for the projects at Units 1 and 2, respectively. Counts 2 and 4 allege violations by all Defendants of the Title V provisions of the Clean Air Act, 42 U.S.C. §§ 7661-7661(f), and the Pennsylvania Title V program, for the

4

subsequent operation of Units 1 and 2, respectively.  The United States seeks injunctive relief and the assessment of civil penalties since March 15, 2004.

On January 13, 2011, PADEP and New York intervened in the action and filed a five-count Complaint which provides more factual details, asserts similar violations of the PSD and Title V provisions of the federal Clean Air Act, asserts corresponding violations of the Pennsylvania Air Pollution Control Act ("APCA"), 35 P.S. § 4001, et seq., and its implementing regulations, and adds a common law public nuisance claim.   Additionally, New Jersey filed a separate three-count Intervenor Complaint which asserts essentially the same federal Clean Air Act claims set forth by the United States.  The Intervenors assert standing under the Clean Air Act citizen suit provision, 42 U.S.C. § 7604(a)(1), and seek injunctive relief and civil penalties relating back to the dates of the original projects.

**Standard of Review**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of a complaint.  The Court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff.  However, as the Supreme Court made clear in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007), the "factual allegations must be enough to raise a right to relief above the speculative level." *Id.*  The Supreme Court has subsequently broadened the scope of this requirement, stating that only a complaint that states a ***plausible*** claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009) (emphasis added).  A district court must conduct a two-part analysis when presented with a motion to dismiss for failure to state a claim.  First, the Court must separate the factual and legal elements of the claim. *Fowler v. UPMC Shadyside*, 578 F.3d

**JA 010**

203, 210 (3d Cir. 2009). Although the Court "must accept all of the complaint's well-pleaded

facts as true, [it] may disregard any legal conclusions." *Id*. at 210-211. Second, the Court "must

then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff

has a 'plausible claim for relief.' In other words, a complaint must do more than allege the

plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts."

*Id*. at 211 (citing *Iqbal,* 129 S. Ct. at 1949). The determination of "plausibility" will be "'a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense.'" *Id*. at 211 (quoting *Iqbal,* 129 S. Ct. at 1950).

### Legislative Overview

This case primarily involves statutory interpretation of the Clean Air Act. In *Alston v.*

*Countrywide Financial Corp*., 585 F.3d 753 (3d Cir. 2009), the Court of Appeals for the Third

Circuit described the task as follows:

> The role of the courts in interpreting a statute is to give effect to Congress's
> intent.... Because it is presumed that Congress expresses its intent through the
> ordinary meaning of its language, every exercise of statutory interpretation begins
> with an examination of the plain language of the statute. When the statute's
> language is plain, the sole function of the courts-at least where the disposition
> required by the test is not absurd-is to enforce it according to its terms.

*Id*. at 759 (citations omitted). Accordingly, the Court begins with an examination of the

applicable statutory framework.

In 1970, in response to dissatisfaction with existing air pollution programs, Congress

enacted amendments to the Clean Air Act which significantly increased the federal oversight

role. The statute was intended "to guarantee the prompt attainment and maintenance of specified

air quality standards." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 469 (2004).

Plaintiffs contend that the decision in this case should uphold the fundamental purpose of the

JA 011

Clean Air Act to reduce air pollution. The statute required the EPA to promulgate national ambient air quality standards (NAAQS) for pollutants, including SO2, which may reasonably endanger public health or welfare. 42 U.S.C. §§ 7408, 7409. Each state was required to submit for EPA approval a State Implementation Plan (a "SIP") to implement, maintain and enforce NAAQS. 42 U.S.C. § 7410.[4] In addition, the EPA was required to develop "technology-based performance standards" designed to limit emissions from major sources of pollution. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 846 (1984); 42 U.S.C. § 7411(b).

As with most legislation, the Clean Air Act amendments reflected a congressional compromise. As explained in *Chevron,* 467 U.S. at 847: "the legislative struggle was basically between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes would retard industrial development with attendant social costs." As one legislative compromise, the Clean Air Act has less stringent regulations regarding existing power plants as compared to newly constructed sources of electricity. In other words, existing plants were "grandfathered" in recognition of the expense of retrofitting pollution-control equipment. *Compare* 42 U.S.C. §§ 7411(d) and (f). As explained in *Wisconsin Elec. Power Co. v. Reilly,* 893 F.2d 901, 909 (7th Cir. 1990):

> Consistent with its balanced approach, Congress chose not to subject existing plants to the requirements of NSPS and PSD. Members of the House recognized that "[b]uilding control technology into new plants at time of construction will plainly be less costly then [sic] requiring retrofit when pollution control ceilings are reached." H.R.Rep. No. 294, 95th Cong., 1st Sess. 185, reprinted in 1977 U.S.Code Cong. & Admin.News at 1264. But Congress did not permanently exempt existing plants from these requirements; section 7411(a)(2) provides that

---

[4] SIP provisions must meet federal standards, are subject to review and approval by the EPA, and are federally enforceable once approved. States have broad discretion in designing their SIPs, but the plans must include certain federal standards and are subject to EPA review and approval. *See Alaska Dep't*, 540 U.S. at 470. At all times relevant to this case, Pennsylvania had an EPA-approved SIP.

JA 012

existing plants that have been modified are subject to the Clean Air Act programs at issue here.

*Accord United States v. Cynergy Corp.*, 458 F.3d 705, 709 (6th Cir. 2006) (Clean Air Act treats old plants more leniently than new ones but there is an expectation that old plants will wear out and be replaced by new ones which are subject to more stringent pollution controls). Utility companies are not entitled to evade the Clean Air Act requirements by keeping the grandfathered power plants in operation indefinitely. *Alabama Power Co. v. Costle,* 636 F.2d 323, 400 (D.C. Cir. 1979) ("The statutory scheme intends to 'grandfather' existing industries; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program.") Accordingly, the PSD permit requirements apply to both newly-constructed facilities and those that have had a "major modification" that would result in a "significant net emissions increase." *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 568-69 (2007); 42 U.S.C. § 7411(a)(2). This case involves projects at "grandfathered" units of the Homer City Plant which Plaintiffs allege should have triggered the more rigorous Clean Air Act emissions standards.

PSD Program

Congress amended the Clean Air Act again in 1977 to add the "Prevention of Significant Deterioration" (PSD) program, which was intended to ensure that air quality in areas which were already "clean" (i.e., in compliance with NAAQS) would not degrade. *Alaska Dep't*, 540 U.S. at 470-71. The statutory authority for the PSD program is in Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470-7479. Initially, the PSD program applied only to construction of new sources of pollution. However, in November 1977, Congress passed a technical amendment which made the PSD program applicable to projects of modifications to grandfathered plants.

**JA 013**

Safe Drinking Water Amendments of 1977, Pub. L. No. 95-190, 91 Stat. 1393, 1402 (1977)

("The term ['construction'] when used in connection with any source or facility, includes the

modification (as defined in [42 U.S.C. § 7411(a)(4)]) of any source or facility").  *See United

States v. Duke Energy Corp.*, 411 F.3d 539, 548 (4th Cir. 2005), rev'd on other grounds, 549 U.S.

561 (2007); *Alabama Power*, 636 F.2d at 401 n. 49.  The implications of this "technical

amendment" were not fully appreciated at the time.

    In this case, Plaintiffs allege that Defendants violated 42 U.S.C. § 7475(a), which is

entitled "Preconstruction Requirements" and provides as follows:

    (a) Major emitting facilities **on which construction is commenced**

    No major emitting facility on which construction is commenced after August 7,
    1977, ***may be constructed*** in any area to which this part applies ***unless***--

    (1) **a permit has been issued** for such proposed facility in accordance **with this
    part** ***setting forth emission limitations for such facility*** which conform to the
    requirements **of this part**;

    (2) **the proposed permit has been subject to a review** in accordance with this
    section, the required analysis has been conducted in accordance with regulations
    promulgated by the Administrator, and a public hearing has been held with
    opportunity for interested persons including representatives of the Administrator
    to appear and submit written or oral presentations on the air quality impact of
    such source, alternatives thereto, control technology requirements, and other
    appropriate considerations;

    (3) the owner or operator of such facility demonstrates, as required pursuant to
    section 7410(j) of this title, that emissions **from construction or operation** of
    such facility will not cause, or contribute to, air pollution in excess of any (A)
    maximum allowable increase or maximum allowable concentration for any
    pollutant in any area to which this part applies more than one time per year, (B)
    national ambient air quality standard in any air quality control region, or (C) any
    other applicable emission standard or standard of performance under this chapter;

    (4) **the proposed facility is subject to the best available control technology** for
    each pollutant subject to regulation under this chapter emitted from, or which
    results from, such facility;

**JA 014**

(5) the provisions of subsection (d) of this section with respect to protection of class I areas have been complied with for such facility;

(6) there has been an analysis of any air quality impacts projected for the area as a result of growth associated with such facility;

(7) the person who owns or operates, or proposes to own or operate, a major emitting facility **for which a permit is required under this part** agrees to conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality in any area which may be affected by emissions from such source; and

(8) in the case of a source which proposes to construct in a class III area, emissions from which would cause or contribute to exceeding the maximum allowable increments applicable in a class II area and where no standard under section 7411 of this title has been promulgated subsequent to August 7, 1977, for such source category, the Administrator has approved **the determination of best available technology as set forth in the permit**.

42 U.S.C. § 7475(a) (emphasis added).

According to the plain meaning of the language of the statute, § 7475(a) provides that "No major emitting facility . . . may be constructed" unless each of the statutory conditions are met. One of the preconditions to construction is the installation of Best Available Control Technology ("BACT"). § (a)(4). BACT is not a particular type of technology. Rather, it is defined in the Act as an "emission limitation based on the maximum degree of reduction of each pollutant subject to regulation ... which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable" for the facility in question. 42 U.S.C. § 7479(3). As provided in §§ 7475(a)(1) and (a)(8), the Clean Air Act determination of emissions limitations and BACT for the facility are to be "set forth" in the PSD permit.

The PSD requirements are forward-looking and framed in terms of that which utilities must do before commencing construction. Accordingly, an operator's duty is "not prescience, but merely a reasonable estimate of the amount of additional emissions that the change will

10

cause." *Cynergy*, 458 F.3d at 709; *United States v. Ohio Edison Co.*, 276 F. Supp.2d 829, 863

(S.D. Ohio 2003) (operator must perform pre-construction estimate of whether change will result

in significant net emissions increase). Thus, in this case the Former Owners were required to

have made a reasonable estimate, in advance, of whether the 1991, 1994, 1995 and 1996 projects

constituted major modifications which would result in a significant increase of SO2 emissions.

The regulations provide guidance but there are no clear, bright-line rules. In *Cynergy*, 458 F.3d

at 709, the Court recognized that "it may be a very difficult estimate to make." In *United States*

*v. Ohio Edison Co*., 276 F. Supp.2d 829, 832 (S.D. Ohio 2003), the Court lamented "an abysmal

breakdown in the administrative process" in which various administrations have failed to address

the  fundamental issue of "at what point plants built before 1970 must comply with new air

pollution standards."


Title V Program

The Clean Air Act was again amended in 1990 (thirteen years after the PSD program was

enacted) to provide the Title V statutory regime which governs the consideration and issuance of

operating permits at power plants. The Complaints allege that Defendants violated 42 U.S.C. §§

7661a(a), 7661b(c) and 7661c(a). Those statutory sections provide in relevant part as follows:

§ 7661a(a) Violations

After the effective date of any permit program approved or promulgated
**under this subchapter**, it shall be unlawful for any person **to violate any**
**requirement of a permit** issued **under this subchapter**, **or to operate** an
affected source (as provided in subchapter IV-A of this chapter), a major source,
any other source (including an area source) subject to standards or regulations
under section 7411 or 7412 of this title, any other source **required to have a**
**permit under parts C** or D **of subchapter I** of this chapter, or any other
stationary source in a category designated (in whole or in part) by regulations
promulgated by the Administrator (after notice and public comment) which shall
include a finding setting forth the basis for such designation, **except in**

JA 016

**compliance with a permit** issued by a permitting authority **under this subchapter**. (***Nothing in this subsection shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification.***)

§ 7661b(c) Deadline

Any person required to have a permit shall, not later than 12 months after the date on which the source becomes subject to a permit program approved or promulgated **under this subchapter**, or such earlier date as the permitting authority may establish, **submit** to the permitting authority **a compliance plan and an application for a permit** signed by a responsible official, who shall certify the accuracy of the information submitted. The permitting authority shall approve or disapprove a completed application (consistent with the procedures established under this subchapter for consideration of such applications), and shall **issue or deny the permit** . . .

§ 7661c(a) Conditions

Each permit issued under this subchapter **shall include enforceable emission limitations and standards**, a schedule of compliance, a requirement that the permittee submit to the permitting authority, no less often than every 6 months, the results of any required monitoring, **and such other conditions as are necessary to assure compliance with applicable requirements of this chapter**, including the requirements of the *applicable implementation plan*.[5]

(Emphasis added).

To summarize these sections, power plant operators must submit a compliance plan and a Title V permit application to regulators, who shall after review issue or deny the Title V operating permit. § 7661b. Each Title V permit is required to include all emission limitations and standards, and "such other conditions" necessary to assure a plant's compliance with the Clean Air Act. § 7661c. It is unlawful to violate a condition of a Title V permit or to operate a plant other than in compliance with a Title V permit. § 7661a. Title V recognizes that sources may be required to obtain a permit under the PSD program (part C of subchapter I) but specifically limits a source's compliance obligation to permits issued "under this subchapter," i.e., Title V permits.

---

[5] The United States Brief at 28 misquoted the statutory text by replacing the italicized phrase "applicable implementation plan" with the phrase "applicable PSD requirements."

JA 017

§ 7661a.  Title V does not alter the requirements of the PSD program to obtain a preconstruction

permit.  § 7661a.

Structurally, it is clear that PSD and Title V are two separate programs, enacted at

different times, and specified in different subchapters of the Clean Air Act. [6]   As explained in

*United States v. Marine Shale Processors*, 81 F.3d 1329, 1356 (5th Cir. 1996):

> The Clean Air Act statutory scheme contemplates at least two different types of
> air permits unhappily named "preconstruction permits" and "operating permits,"
> with confusion easily resulting from the fact that preconstruction permits often
> include limits upon a source's operations. Preconstruction permits result from a
> review process that occurs before construction of or major modification to a
> stationary source. At this stage, the permitting authority must determine whether
> the proposed construction or modification would violate a state's emissions
> control strategy or interfere with the attainment or maintenance of Clean Air Act
> air quality standards. 40 C.F.R. § 51.160(a)(1-2). In contrast, operating permits
> focus on a source's current emissions, even if the source has not recently
> undergone construction or major modification. *See* 40 C.F.R. § 70.1(b) ("All
> sources subject to these regulations shall have a permit to operate...."). The
> distinction between preconstruction and operating permits is critical.

*See also United States v. Illinois Power Co.*, 245 F. Supp.2d 951, 955 (S.D. Ill. 2003) (noting the

distinction between violations of preconstruction permit requirements and operating permit

requirements).

Title V permits do not generally impose any new emission limits, but are intended to

incorporate into a single document all of the Clean Air Act requirements applicable to a

particular facility.  *See Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738,

742 (9th Cir. 2008).  Similar to other Clean Air Act programs, Title V is implemented primarily

by the states under EPA oversight.  *See id.*  In states with EPA-approved programs, Title V

---

[6] Plaintiffs argue in response to NYSEG's supplemental authority that the Cross-State Air Pollution Rule is separate
and distinct from the PSD program because they are authorized under different provisions of the Clean Air Act (42
U.S.C. § 7410(a)(2)(D) versus 42 U.S.C. § 7410(a)(2)(C)).  Document No. 109 at 3 n.1.  This argument highlights
the separateness of the PSD and Title V programs – which are based not on adjacent sub-sub-subsections of the
same provision, but in different subchapters of the statute.

JA 018

permits are issued by the state permitting authority, subject to EPA review and veto. *See id.* at 742-43; 42 U.S.C. § 7661d.

## Legal Analysis

### A. PSD Claims

Plaintiffs allege that the Former Owners violated the PSD program by having undertaken construction projects without having obtained the necessary PSD preconstruction permits. Plaintiffs also allege that the Current Owners violated the PSD program by failing to implement BACT at units that had been improperly modified because the PSD program imposes ongoing obligations at modified facilities.

The PSD program is rather straight-forward when applied to construction of new plants but is difficult to enforce when applied to operating, grandfathered facilities. Because grandfathered facilities are subject to less stringent rules regarding emissions, power plant operators have an obvious incentive to attempt to keep them in operation as long as possible to avoid the cost of installing more advanced pollution controls. *See Cynergy*, 458 F.3d at 709. In addition, there are often no clear-cut rules for specifically determining which projects will trigger the PSD requirements. *Id.* Again, power plant operators have an obvious incentive to make a "reasonable" prediction that the stricter emissions standards will not be implicated. Nevertheless, the PSD regulations are only triggered if and when the power plant operator (the person with an incentive to avoid the program) voluntarily "self-reports" by applying for a preconstruction permit. There is no mechanism – other than post-hoc litigation – by which environmental regulators are empowered to trigger the PSD and BACT requirements. In other words, the PSD program is somewhat reliant on the proverbial fox to guard the henhouse.

14

If the operator determines (rightly or wrongly) that a pre-construction PSD permit is not necessary for a particular modification of the plant, no specific action is required on anyone's part -- the operator simply continues to run the plant as usual. The statutory and regulatory mechanisms for implementing pollution controls are not triggered. No pre-construction permit is issued by which operating conditions may be established or later incorporated into a Title V permit. The process to determine BACT case-by-case at the facility does not occur. As explained in *United States v. Midwest Generation, LLC*, 694 F. Supp.2d 999, 1007 (N.D. Ill. 2010):

> The provision regarding "best available control technology" does not stand alone, but appears within the context of "preconstruction requirements." It is determined on a case-by-case basis through the permitting process itself. Tellingly, the Plaintiffs' brief states that "[i]f a PSD permit had been issued for each of the alleged modifications, each permit would have set forth [best available control technology] requirements." (Pl. Opp'n Br. 4.) This underscores the fact that the ongoing requirements cited by Plaintiffs are tied to the application of the permit and that it is the original failure to obtain that permit which violates these PSD provisions. There is no obligation to apply "best available control technology" in the abstract.

This same structural difficulty within the PSD program was also noted in *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1016 (8th Cir. 2010):

> Where, as here, the operator never applied for any PSD permits, there is no application and no approval with which it can comply. Thus, while Otter Tail may have violated § 52.21(r)(1) by failing to apply for PSD permits in the first place, it does not continue to do so by failing to comply with a hypothetical set of operational parameters that would have been developed through the permitting process.

*Accord National Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority (Nat'l Parks 11th Cir.)*, 502 F.3d 1316, 1325 (11th Cir. 2007) (BACT is to be determined through the preconstruction permitting process).

JA 020

These structural aspects of the PSD program (vague triggering standards and reliance on the operator to voluntarily apply for a permit and enter the program) are amplified when a grandfathered facility changes ownership. In this case, the Former Owners apparently decided in 1991, 1994, 1995 and 1996 that permits under the PSD program were not needed for the projects at issue. Accordingly, PSD permits were not applied for or obtained and the Plant continued with its normal operations. In each instance, the five-year statute of limitations for recovering a civil penalty for a PSD violation expired without any challenge from federal or state regulators. The Former Owners did apply for a Title V permit, which was under consideration by the reviewing agency for almost ten years. A Title V permit was eventually issued in January 2004. When the Current Owners purchased the Plant, there was no pending alleged violation of the PSD program that the purchasers could have discovered during their due diligence.[7] It was not until 2008 and 2010 that NOV's were issued to retrospectively challenge the 1991, 1994, 1995 and 1996 decisions to not obtain PSD permits. Thus, it is difficult to understand how the Current Owners could have avoided PSD liability under Plaintiffs' theory of the case. The Current Owners did not own or operate the Plant at the time the projects at issue were undertaken and there was no indication that the Former Owners had committed a PSD violation. In essence, Plaintiffs' theory would require the Current Owners to have filed an application for a prophylactic PSD permit immediately upon acquisition of the Plant, just in case any work done by the Former Owners was later determined to have triggered the PSD program requirements.

Understandable frustration with apparent efforts to evade the PSD program has led some courts to construe § 7475(a) more broadly than others. In *United States v. Am. Elec. Power Serv.*

---

[7] At this stage of the case, the Court assumes that the 1991, 1994, 1995 and 1996 Projects should have triggered the PSD permitting requirements. However, to succeed in their claims, it is Plaintiffs' burden to prove that each of Defendants' projects constituted a major modification that would have significantly increased SO2 emissions. *United States v. Eastern Kentucky Power Co.*, 498 F. Supp.2d 995 (E.D. Ky. 2007); *Sierra Club v. Morgan*, 2007 WL 3287850 *12 (W.D. Wis. 2007).

**JA 021**

*Corp.*, 137 F. Supp.2d 1060, 1066 (S.D. Ohio 2001), the Court commented that "it is illogical to conclude that a defendant may only be held liable for constructing a facility, rather than operating such facility, without complying with the permit requirements." In *New Jersey v. Reliant Energy MidAtlantic Power Holdings, LLC*, 2009 WL 3234438 (E.D. Pa. 2009), the Court extended this reasoning to suggest that an operator may be held liable "simply because its predecessor owner failed to secure the appropriate permit." *See also New York v. Niagara Mohawk Power Corp.*, 263 F.Supp.2d 650, 663 (W.D.N.Y. 2003) (allowing operator to use its own failure to obtain preconstruction permit as a shield "would lead to absurd and surely unintended results"). This contention might be persuasive if the failure to obtain a PSD permit was "cut and dry" and indisputable (as it may be when applied to new construction). However, in the factual scenarios described in many of the reported cases which involve grandfathered facilities, such is seldom the case. To the contrary, the power plant operators often vigorously contest their alleged PSD liability and assert that they were ***not*** required to obtain a PSD permit because, *inter alia*, the projects constituted "routine maintenance, repair and replacement" or were forecasted to not result in significant increases in emissions. It is often unclear, even in retrospect, whether the operators or the government regulators are correct. *See Cynergy*, 458 F.3d at 709. For example, in this case the Intervenors – but not the United States – contend that the 1995 and 1996 reheater projects triggered the PSD program requirements.

Thus, there is, indeed, a principled and logical basis for distinguishing between the original decision to not obtain a permit and subsequent operations. If the operator wrongly failed to obtain a PSD pre-construction permit, it is that decision -- rather than post-project operations based on the assumption that no permit was needed -- that is sensibly subject to post-hoc, retrospective challenge. In other words, at least in the context of grandfathered, operating

**JA 022**

facilities that have changed ownership, it is reasonable to construe § 7475(a) in accordance with its plain text as being directed to the initial decision of whether or not to obtain a preconstruction PSD permit.

With this background, the Court turns to the specific claims in this litigation.

### 1.  Civil Penalties

The United States seeks civil penalties commencing on March 15, 2004, based upon the default five-year federal limitations period set forth in 28 U.S.C. § 2462.  The Intervenor Complaints seek civil penalties commencing from the time of the projects in the early 1990s. However, the Intervenors have since abandoned their claim for civil penalties and have explained that they now seek only injunctive relief.  Intervenors' Brief at 37 n. 15.

The United States seeks civil penalties only from the Current Owners.  The government contends that the Current Owners violated an independent, continuing obligation under § 7574(a)(4) to bring the Plant into compliance with BACT and operated the Plant after the projects contrary to the PA SIP, citing *Sierra Club v. Dairyland Power Coop.*, 2010 WL 4294622 * 12 (W.D. Wisc. 2010).  The Current Owners contend that they did not violate the PSD program and that any claims for civil penalties are time-barred.

A PSD violation occurs, at the latest, at the time of the construction project.  *Midwest Generation*, 694 F.Supp.2d at 1009 ("PSD violation occurs at the time the alleged construction or modification begins").  The applicable statutory provision, 42 U.S.C. § 7475, is entitled "Preconstruction Requirements" and states that no major emitting facility "may be constructed" unless it satisfies the listed prerequisites.  The majority rule is that a failure to obtain a PSD

JA 023

permit is a one-time violation and is not a continuing violation. As persuasively explained in

*New York v. Niagara Mohawk*, 263 F.Supp.2d at 661:

> A given construction or modification project occurs only once. If a permit is not obtained for that particular project, then the preconstruction permit requirement of the Clean Air Act has been violated. However, the requirement to secure a preconstruction permit applies prior to construction or modification. Once the construction or modification is complete, the window in which to apply for and obtain a preconstruction permit is gone. Thus, a violation of the Clean Air Act's preconstruction permit requirement is singular in nature, and does not constitute an ongoing violation.

*See also Sierra Club v. Portland Gen. Elec. Co.*, 663 F.Supp.2d 983, 991-92 (D. Or. 2009)

(recognizing majority rule and collecting cases); *United States v. Illinois Power Co.*, 245

F.Supp.2d 951, 957 (S.D. Ill. 2003) ("a violation of the Clean Air Act's preconstruction permit

requirements ... occurs at the time of the construction or modification and is not continuing in

nature");  *United States v. Southern Ind. Gas & Elec. Co.*, 2002 WL 1760752, *4 (S.D. Ind.

2002) ("failure to obtain a preconstruction permit is a discrete violation that occurs at the time of

construction"); *United States v. Westvaco*, 144 F.Supp.2d 439, 443 (D. Md. 2001)

("preconstruction permit violations occur only at the time of the construction or modification of

the emitting facility"); *United States v. Murphy Oil USA, Inc.*, 143 F.Supp.2d 1054, 1083-84

(W.D. Wis. 2001) ("the statute of limitations for a violation of the preconstruction permit

requirements ... begins to run at the time of construction and does not continue through the

operational life of the modified source"); *United States v. Brotech Corp.*, 2000 WL 1368023 *3

(E.D. Pa. 2000) ("[v]iolations of the various requirements to obtain construction permits or plan

approvals occur at the time of the construction, modification, or installation of the equipment or

facility"); *United States v. Campbell Soup Co.*, 1997 WL 258894, *2 (E.D. Cal. 1997) ("the

regulation cannot reasonably be construed to mean that building or altering a machine without a

permit is a violation that continues as long as the machine still exists or is operated").  Two

**JA 024**

courts of appeals have concluded that failure to obtain a PSD permit is a one-time, non-continuing violation. *See National Parks 11th Cir.*, 502 F.3d at 1322; *Otter Tail*, 615 F.3d at 1017; *but see National Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority ("Nat'l Parks 6th Cir.")*, 480 F.3d 410, 419 (6th Cir. 2007) (concluding that PSD violation was ongoing based on language in Tennessee SIP). In sum, the alleged PSD violations occurred, if at all, when the Former Owners failed to apply for a preconstruction PSD permit in 1991, 1994, 1995 and 1996. Because the Current Owners were not involved in this conduct, they cannot be held liable under the PSD provisions of the Clean Air Act.

*Dairyland Power,* 2010 WL 4294622, represents a distinct minority view and did not involve a change in ownership, as occurred in this case. In essence, the *Dairyland Power* Court noted the several references to "operations" in § 7475(a) and concluded that: "although the obligations to apply best available control technology, conduct monitoring and make air quality demonstrations may be determined during the permitting process and included in a PSD permit, they are obligations independent of the permit requirement" such that Plaintiffs could bring a separate claim for the alleged failure to implement BACT. *Id.* at *5.[8] This Court respectfully cannot agree. Of course, if a scrubber was determined to be BACT and thus required to be installed at the Plant as a condition of obtaining a PSD permit, that scrubber would obviously be intended to remain in place for future operations. *See* 42 U.S.C. 7410(j) (As a condition for issuance of any permit required under this subchapter (i.e., a PSD permit), the operator must show that the "construction or modification and operation of such source will be in compliance with all other requirements of this chapter.") However, in this case, the Former Owners never obtained a PSD permit and no such condition was ever established. Under the plain text of §

---

[8] The *Dairyland Power* Court interpreted the Wisconsin SIP to make the PSD requirements applicable post-construction, *id.* at * 14, and was concerned that the owner not be rewarded for its failure to obtain a PSD permit. *Id.* at *15.

**JA 025**

7475(a), the references to operations occur only within the conditions listed in subsections (1) – (8), after the "unless" clause. The only actual, actionable prohibition in § 7475(a) is that "No major emitting facility . . . may be constructed." In short, BACT is a prerequisite condition to obtaining a PSD permit -- not an independent, freestanding obligation. Congress could have provided that it is an independent PSD violation to operate a plant without BACT, but it did not do so. *See Sierra Club v. Duke Energy Indiana, Inc*., 2010 WL 3667002 * 7 (S.D. Ind. 2010).

In summary, the Court concludes that the alleged PSD violations constitute singular, separate failures by the Former Owners to obtain pre-construction permits, rather than ongoing failures to comply with whatever hypothetical conditions might have been imposed during the PSD permitting process.[9] Thus, the United States was required to file suit to recover civil penalties for an alleged PSD program violation within five years of the construction project, as provided in the default federal statute of limitations, 28 U.S.C. § 2462.[10] Because the projects at issue in this case occurred 15-20 years ago and no enforcement action was taken until 2008, the limitations period has long since expired. Accordingly, no civil penalties are recoverable for the alleged PSD violations.

## 2. Injunctive Relief

Plaintiffs contend that even if they are unable to recover civil penalties for the alleged PSD program violations, they are entitled to obtain injunctive relief against all Defendants. Specifically, Plaintiffs ask the Court to enjoin the Current Owners from operating the Plant

---

[9] The United States' brief at p. 10 misleadingly quoted § 7413(b). The actual text of § 7613(b) states, in relevant part, that the Administrator may commence a civil action "(1) Whenever such person has violated, or is in violation of, any requirement or prohibition of ***an applicable implementation plan or permit***." The United States replaced the highlighted text with a generic reference to "[the Act.]" Contrary to the United States' suggestion, the Administrator is not empowered by this section to litigate a free-standing violation of "the Act," but instead, must point to a violation "of an applicable implementation plan or permit." The fundamental problem in this case is that the Former Owners never obtained a PSD permit that would have imposed the applicable requirements.

[10] Plaintiffs have not attempted to plead a basis for equitable tolling of the limitations period.

**JA 026**

except in accordance with the PSD permit regulations and to order all Defendants to remedy past violations by cooperating to install BACT at the Plant. Plaintiffs emphasize the breadth and flexibility of the court's equitable powers and contend that the relief sought is not impossible to implement.

The Current Owners contend that they cannot be held liable for injunctive relief because they did not violate the PSD program. The Court agrees. As explained above, the statutory prohibition in the PSD program, § 7475(a), is having commenced construction or modification without a permit. This alleged violation involved the Former Owners exclusively. As the Court explained in *Niagara Mohawk*, 263 F.Supp.2d at 668-69:

> By its plain terms, 42 U.S.C. § 7475(a) does not impose liability on any person other than the one who fails to comply with its requirements. Preconstruction obligations are imposed only upon the person who actually seeks to construct or modify a facility within the meaning of the Act. . . . Here, there is no dispute that the NRG Defendants neither owned nor operated the Facilities at the time the modifications allegedly occurred. (Amended Complaint, ¶ 13.) The NRG Defendants are after-the-fact, third-party purchasers. Hence, the NRG Defendants had neither the obligation nor the ability to comply with the mandates of 42 U.S.C. § 7475(a). Even assuming the truth of the allegations contained in the Amended Complaint, that is, that the Facilities were modified without fulfillment of the preconstruction requirements, 42 U.S.C. § 7475(a) does not give rise to a cause of action against the NRG Defendants.

The same analysis applies to the Current Owners in this case. They could not possibly have applied for a PSD pre-construction permit for the 1991, 1994, 1995 or 1996 modification projects because they had no connection to the Plant or the Former Owners at that time. It is axiomatic that in order to obtain injunctive relief, a Plaintiff must first establish a successful claim on the merits. *See, e.g., Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc.*, 747 F.2d 844, 850 (3d Cir. 1984) (before issuing permanent injunction, "the court must determine if the plaintiff has actually succeeded on the merits"). Plaintiffs cannot succeed on a PSD claim

JA 027

against the Current Owners, as a matter of law. Accordingly, the PSD claims against the Current

Owners, including the request for injunctive relief, will be dismissed with prejudice.

The more difficult question is whether this Court may award injunctive relief under the

PSD program against the Former Owners. It is certainly clear from the statutory text of 28

U.S.C. § 2462 that the five-year limitations period applicable to civil penalties does not place a

time limit on Plaintiffs' ability to obtain injunctive relief. The Court recognizes that SO2

emissions have been ongoing, and likely would have been dramatically reduced had the Former

Owners applied for a PSD permit. The Former Owners contend that the Court lacks the

authority to award injunctive relief for numerous reasons: (1) § 7413(b) authorizes only forward-

looking relief, as opposed to remedies of past violations; (2) the lack of precedential authority;

(3) requiring the Former Owners to pay money for installation of a scrubber would constitute a

remedy at law, penalty or forfeiture, *see Reliant Energy*, 2009 WL 3234438 at * 17 (rejecting

analogous effort to require a former owner to pay for the installation of BACT to remedy the

alleged failure to obtain a PSD permit); (4) the requested injunction is impossible to implement

because they no longer possess the Plant, *see Midwest Generation*, 2011 WL 1003916

(dismissing PSD claims for injunctive relief against former owner); and (5) the concurrent

remedy doctrine. The Former Owners also contend that Plaintiffs have failed to demonstrate an

entitlement to injunctive relief, that an emergency exists, the lack of alternative remedies,[11] or

that regulators acted diligently to enforce the PSD provisions, *see United States v. Cinergy

Corp.*, 582 F. Supp.2d 1055, 1066 (S.D. Ind. 2008) ("a significant delay between a violation and

---

[11] Defendants suggest that the regulators could have: (1) challenged the failure to get a PSD permit within five years of the projects; and (2) challenged issuance of the Title V permit; and may now (3) revise the SIP, 42 U.S.C. § 7410(k); (4) file a petition regarding upwind/downwind states, 42 U.S.C. § 7426; (5) assert emergency authority, 42 U.S.C. § 7603; and (6) address the alleged harms via the recently promulgated Cross State Air Pollution Rule. The Court expresses no opinion as to the viability of any of these options.

JA 028

the USA's filing suit may be relevant in determining whether to grant injunctive or other equitable relief at all").

The Court is reluctant to conclude, as a broad principle, that it lacks authority to award injunctive relief under the PSD program, *see id.*, and it need not do so to resolve this case. Plaintiffs must demonstrate not only that injunctive relief is within the Court's power in theory, but also that there is a plausible basis for granting such relief in this case. As explained by the United States Supreme Court, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313 (1982); *Accord Natural Resources Defense Council v. Texaco Refining and Mkt., Inc*., 906 F.2d 934 (3d Cir. 1990). For example, in *United States v. Price*, 688 F.2d 204 (3d Cir. 1982) (involving emergency powers under the Safe Drinking Water Act), which was cited by both sides, the Court of Appeals noted the broad and flexible equitable powers available to the courts, but nevertheless affirmed the district court's denial of injunctive relief that would have required current and former owners of a waste site to fund a public health study.

In this case, the facts alleged in the Complaints fall far short of those necessary to render a claim for injunctive relief plausible. Injunctive relief is a rare and extraordinary remedy which should be granted in only limited circumstances. *See, e.g., Frank's GMC*, 847 F.2d at 102. The relief sought in this case against former owners is even more novel, and was rejected at the Rule 12(b)(6) stage in the *Midwest Generation* and *Reliant Energy* cases.

In particular, the purpose of an injunction is to prevent future violations. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953). As a result, before an injunction may properly issue,

**JA 029**

the court must find that there exists some cognizable danger of recurrent violation. The moving

party bears the burden of satisfying the court that such danger exists and that injunctive relief is

necessary. *Id.* As the Court of Appeals for the Third Circuit recently explained:

> While "the court's power to grant injunctive relief survives discontinuance of the
> illegal conduct, the purpose of an injunction is to prevent future violations."
> *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303
> (1953). Where the illegal conduct has ceased, the party seeking the injunction
> bears the burden of proving "that there exists some cognizable danger of recurrent
> violation, something more than the mere possibility which serves to keep the case
> alive." *Id.*

*Primepoint, L.L.C. v. PrimePay, Inc*., 401 Fed. Appx. 663, 664 (3d Cir. 2010) (unpublished);

*accord United States v. SCM Corp.,* 667 F.Supp. 1110, 1128 (D. Md. 1987) (denying request for

injunctive relief under Clean Air Act because there was no danger of recurrent violations).  For

the reasons set forth above, the Court has determined that the Former Owners' alleged PSD

violations constituted wholly-past failures to obtain pre-construction permits that did not

constitute continuing violations.

Plaintiffs also contend that the Court should award injunctive relief to remedy the

continuing harm caused by excess pollution, even if there was a one-time violation, citing

*Cynergy*, 582 F.Supp.2d at 1055.  The Court is not persuaded that Plaintiff has pleaded a

plausible basis for similar relief in this case.  In *Cynergy*, the power plant operator had been

found in violation of the Clean Air Act by a jury and was seeking to limit post-trial discovery

into the remedy.  The court concluded that it had authority to "order a full and complete remedy

for harms caused by a past violation" but noted that it was premature to make any such ruling.

*Id*. at 1066.  There had been no change in ownership, so the *Cynergy* court did not have to

grapple with that complication.  Moreover, the court's reference to continuing *harm* appears to

be inconsistent with the Supreme Court's requirement of a continuing *violation*.  In *Steel Co. v.*

**JA 030**

*Citizens for a Better Environment,* 523 U.S. 83, 109 (1998), the Court held: "Because respondent alleges only past infractions of EPCRA, and not a continuing *violation* or the likelihood of a future *violation*, injunctive relief will not redress its injury." Id. at 109 (emphasis added). Similarly, in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc*., 484 U.S. 49, 66 (1987), the Court explained that defendants are protected from Clean Water Act[12] suits "based solely on *violations* wholly unconnected to any present or future *wrongdoing*." *Id*. at 66-67 (citing *W.T. Grant*) (emphasis added); *Accord Askew v. Trustees of the General Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc*., 776 F.Supp.2d 25 (E.D. Pa. Mar 11, 2011) ("when seeking injunctive relief the plaintiff's burden is not satisfied by proving the occurrence of prior illegal acts, but must include proof of continuing violations") (citations omitted). In *Nat'l Parks 11th Cir*., 502 F.3d at 1322, the Eleventh Circuit Court of Appeals persuasively characterized continued emissions due to the alleged failure to obtain a PSD permit as "present consequences of a one-time violation." Thus, even if injunctive relief to remedy past harms is within the Court's authority, such relief is not warranted for the PSD violation alleged in this case – a failure to obtain a preconstruction permit, followed by continued normal operations of a grandfathered facility.

Plaintiffs have failed to plead any facts to explain the nearly two decade delay in enforcement. Plaintiffs' theory of harm is undercut by the lengthy review and ultimate issuance of a Title V operating permit for the Plant, which is required to contain the "conditions as are necessary to assure compliance" with the Clean Air Act. 42 U.S.C. § 7661c(a). Any future "modification" project undertaken by the Current Owners will trigger a new statute of limitations and a new opportunity for the Plaintiffs to challenge it. Most notably, there is no risk of a PSD

---

[12] In *Gwaltney*, the plaintiffs alleged an ongoing violation of a permit. In this case, by contrast, because no PSD permit was obtained, there can be no ongoing violation.

JA 031

violation in the future because the Former Owners no longer own or operate the Plant. Accordingly, an injunction against the Former Owners is not warranted. The Court need not resolve the parties' remaining contentions regarding injunctive relief. In summary, the PSD claims will be dismissed in their entirety.

### B.  Title V Claims

The Intervenors do not assert Title V claims against the Former Owners. Intervenors' Brief at 23 n.7. It is unclear whether the United States continues to assert Title V claims against all Defendants. In any event, the Title V claims against the Former Owners are clearly without merit for the simple reason that they never owned or operated the Plant during the relevant time period. The Former Owners sold the Plant in 1999 and the Title V operating permit was not issued until 2004. United States' Complaint ¶¶ 61-62. Accordingly, the Title V claims against the Former Owners will be dismissed with prejudice.

The Title V claims against the Current Owners require more in-depth analysis. Unlike a PSD violation, a Title V operating permit violation would not be a discrete, one-time event. As explained in *United States v. Westvaco,* 144 F.Supp.2d at 443-44:

> [There is] a significant distinction between a failure to obtain preconstruction permits and plan approvals and failure to obtain *operating* permits. The latter violation would be continuing since every day of operation without an operating permit is another violation. In contrast, a violation for failure to obtain a construction permit does not continue once the unpermitted construction is completed.

Accordingly, the Title V claims are not time-barred.

The gravamen of Plaintiffs' theory is that "Defendants are illegally operating without a Title V operating permit that imposes BACT limits on modified units." United States Brief at 28. Plaintiffs argue that by failing to acknowledge that the 1991, 1994, 1995 and 1996 projects

JA 032

triggered the PSD regulations, the Former Owners allegedly filed an incomplete Title V permit application, which "led to the issuance of a deficient Title V permit that lacked necessary pollution controls for the modified units." United States Brief at 30. In other words, Plaintiffs argue: (1) that Title V incorporates the PSD and BACT requirements; and (2) that Defendants do not have a valid Title V permit. Neither argument is persuasive.

The "incorporation" argument is contrary to the statutory text. 42 U.S.C. § 7661a(a) provides that it is unlawful "to violate any requirement of a permit issued under **this subchapter**, or to operate [a plant] except in compliance with a permit issued by a permitting authority under **this subchapter**." (Emphasis added). On its face, Title V does not incorporate compliance with the PSD program as a condition of a Title V permit.[13] To the contrary, although § 7661a recognizes that sources may be required to obtain PSD permits, the prohibited conduct is specifically limited to violations of permits issued under "this subchapter," i.e., Title V permits. It would have been simple for Congress to have provided that a PSD permit violation also constituted a violation of a plant's Title V operating permit, but no such language exists. Instead, the parenthetical in § 7661a(a) specifically cautions that nothing in Title V be construed to alter the applicable PSD requirements regarding preconstruction permits. Thus, the statutory text reflects that Congress intended the requirements of the Title V and PSD programs to be and remain separate and distinct.

Plaintiffs' contention that the Current Owners lack a valid Title V permit is equally unfounded. As an initial matter, the Complaints filed by all Plaintiffs expressly acknowledge that a Title V permit was, in fact, issued for the Plant. As pled, PADEP issued several operating permits for the emission sources at the Plant, the most recent of which is Title V permit No. 32-

---

[13] The PSD program provisions could not have incorporated Title V requirements because that subchapter of the statute was not enacted until 13 years later.

**JA 033**

00055, issued in January 2004, with an amendment effective on December 1, 2004.

PADEP/New York Complaint ¶ 23; New Jersey Complaint ¶ 22.  Thus, any suggestion that

Defendants did not have a Title V operating permit is flatly wrong.[14]  Moreover, Plaintiffs have

not alleged any affirmative condition in the Title V permit which is being violated.  *See Reliant*

*Energy*, 2009 WL 3234438 (rejecting Title V claims for failure to allege a violation of a

provision in the permit).  Instead, they allege that a relevant condition, BACT, has been omitted

from the permit.

Plaintiffs' more nuanced argument is that the Title V permit for the Plant is null and void

because it was based on a flawed application.  According to Plaintiffs, the Former Owners failed

to disclose that they should have obtained PSD permits for the 1991, 1994, 1995 and 1996

projects, which would have resulted in installation of BACT.    But this argument, too, is

unpersuasive.  Because the Former Owners had not applied for a PSD permit, the BACT

standards which may have been triggered during the PSD approval process were not determined

or implemented.  The Former Owners did not apply for a PSD Permit and the process by which

operating requirements such as BACT would have been established was never triggered.   Put

another way, there is no way that the Current Owners could have known that the Title V

application submitted by the Former Owners was flawed, because no PSD violation was ever

established.  A facially valid Title V permit was duly issued by PADEP which "incorporate[d]

into a single document all of the Clean Air Act requirements governing a facility."  *Romoland*

*Sch. Dist.,* 548 F.3d at 742.  The Current Owners were entitled to rely on the facial validity of the

Title V permit.  *See Otter Tail*, 615 F.3d at 1022 ("to allow plaintiffs to raise issues resolved

during the permitting process long after that process is complete would upset the reasonable

---

[14] Similarly, Section 7661b(c) requires power plant operators to apply for a Title V permit, and the Complaints aver that the Former Owners filed such an application in 1995.

**JA 034**

expectations of facility operators and undermine the significant investment of regulatory resources made by state permitting agencies.")  In *United States v. AM General Corp.*, 34 F.3d 472, 475 (7th Cir. 1994), the Court disallowed a similar collateral attack on a facially valid state permit based on a prior modification and reasoned:

> We cannot find in the text of the Clean Air Act, or elsewhere, any indication that Congress expressly or by implication meant to authorize the EPA to mount a collateral attack on a permit by bringing a civil penalty action as many as five years after the permit had been granted and the modification implemented, 28 U.S.C. § 2462, by which time a defendant would have accrued a potential liability in excess of $40 million, even though it had been operating under a permit valid on its face and never before challenged. That would be a harsh remedy and we cannot be confident in the absence of any clues that it was one intended to be useable in the circumstances of this case.

Similar Title V claims were rejected in *Otter Tail* and *Midwest Generation*.  In *Midwest Generation*, 2011 WL 1003916 at *12, the court explained:

> BACT limits are imposed through the preconstruction-permit process. In the absence of such a permit, they do not exist. There "is no obligation to apply [BACT] in the abstract"; it "is a specific prerequisite to obtaining a preconstruction permit" that is "determined on a case-by-case basis through the [PSD] permitting process itself." *Midwest Generation,* 694 F.Supp.2d at 1007.

*Accord Otter Tail*, 615 F.3d at 1017 (BACT limits may be incorporated into a facility's construction plans and PSD permits, but do not establish an ongoing duty to apply BACT independent of the PSD permitting process).  This Court agrees with the reasoning in those cases.[15]

Moreover, this Court harbors substantial subject-matter jurisdiction concerns as to its authority to decide Plaintiffs' challenge to the permit application, because the Clean Air Act

---

[15] In *Commonwealth of Pennsylvania v. Allegheny Energy, Inc*. 2006 WL 1520650 (W.D. Pa. 2006), this Court adopted a Report and Recommendation from a Magistrate Judge, 2006 WL 1509061 at * 6-8, which recommended, *inter alia*, that a claim based on an alleged incomplete Title V permit application not be dismissed.   Subsequent developments in the law, both procedural and substantive, convince the Court that this decision is no longer correct.

JA 035

provides that such challenges must be presented to EPA and the Court of Appeals. *See*

*Dairyland Power*, 2010 WL at 4294622 * 17:

> To the extent that plaintiff is challenging defendant's submission of allegedly incomplete permit applications that resulted in defective Title V permits, I agree with defendant that plaintiff was required to utilize the process set forth in § 7661d. As discussed above, under that section any person who objects to the issuance of a permit or renewal permit may petition the EPA administrator. Judicial review of the administrator's decision is available only through the applicable court of appeals, not in the district court. 42 U.S.C. §§ 7661d(b)(2), 7607. *Reliant Energy*, 2009 WL 3234438, at *19 (dismissing plaintiff's claim based on defective Title V permit for lack of subject matter jurisdiction); *BP Amoco Chemical Co. v. Flint Hills Resources, LLC,* 615 F.Supp.2d 765, 777 (N.D. Ill. 2009) (same).

In summary, the Clean Air Act does not incorporate PSD requirements into Title V

permits, but instead carefully distinguishes violations of permits issued under the Title V

"subchapter" from violations of preconstruction permits obtained under the PSD program. A

Title V permit application was, in fact, submitted and a facially valid Title V permit was, in fact,

duly issued in 2004 for operation of the Plant. The Current Owners cannot be held liable for the

alleged deficiencies and omissions in the underlying application submitted by the Former

Owners. Accordingly, the Title V claims will be dismissed in their entirety.[16]


### C. State Law Claims

In addition to the federal Clean Air Act claims, PADEP and New York allege violations

of the Pennsylvania Air Pollution and Control Act ("APCA") and the Pennsylvania SIP, and

common law public nuisance. These claims were not thoroughly developed (*see* Intervenors'

Brief at pp. 43-44), and they essentially track the federal claims.

The APCA, 35 P.S. § 4002, declares Pennsylvania's policy "to protect the air resources

of the Commonwealth to the degree necessary for the (i) protection of public health, safety and

---

[16] The Court need not reach Defendants' "permit shield" defense based on 42 U.S.C. § 7661c(f).

JA 036

well-being of its citizens; (ii) prevention of injury to plant and animal life and to property; (iii) protection of the comfort and convenience of the public and the protection of the recreational resources of the Commonwealth; (iv) development, attraction and expansion of industry, commerce and agriculture; and (v) implementation of the provisions of the Clean Air Act in the Commonwealth." Section 4006(c) provides that PADEP "is authorized to require that new sources demonstrate in the plan approval application that the source will reduce or control emissions of air pollutants, including hazardous air pollutants, by using the best available technology." The APCA implementing regulations, 25 Pa. Code §§ 121-141, also constitute the PA SIP and are promulgated pursuant to both the APCA and the federal Clean Air Act. In effect, the state and federal enforcement efforts are parallel. As explained in *Commonwealth of Pennsylvania v. Environmental Protection Agency*, 500 F.2d 246, 262 (3d Cir. 1974):

> In enacting the Clean Air Amendments of 1970 Congress created an interlocking governmental structure in which the Federal Government and the states would cooperate to reach the primary goal of the Act ... Under its provisions, state and local governments retain responsibility for the basic design and implementation of air pollution strategies, subject to approval and, if necessary, enforcement by the Administrator. We believe that this approach represents a valid adapt[at]ion of federalist principles to the need for increased federal involvement.

*See also PADEP v. Pennsylvania Power Co.*, 416 A.2d 995, 998 (Pa. 1980) (describing adoption of PA SIP pursuant to federal-state regulatory partnership and dismissing constitutional challenge to SO2 standards).

The PA SIP addresses construction permits separately from operating permits. 25 Pa. Code § 127.11 states, in relevant part, "a person may not cause or permit the ***construction*** or ***modification*** of an air contamination source . . . unless the construction, modification, reactivation or installation has been approved by the Department." This is analogous to the PSD

32

**JA 037**

pre-construction permit program.[17]   Indeed, Plaintiffs represent that the PA SIP is identical to the

federal PSD program in all respects.  PADEP and New York Complaint ¶ 55.  By contrast, 25

Pa. Code § 127.402(a), which parallels the Title V program, states, in relevant part:  "A person

may not ***operate*** a stationary air contamination source ***unless the Department has issued to the***

***person a permit to operate the source*** under this article in response to a written application for a

permit submitted on forms and containing the information the Department may prescribe."  25

Pa. Code § 127.443 (formerly § 127.21) explicitly addresses the incorporation of pre-

construction permits into "Operating permit requirements":

> (a) A person may not cause or permit the operation of a source the construction, modification or reactivation of which, or the installation of an air cleaning device on which, is subject to § 127.11 (relating to plan approval requirements), ***unless the Department has issued a permit to operate*** the source.

> (b) The permit shall be issued with the condition that the source shall operate in compliance with the plan approval, the conditions of the plan approval and the conditions of the ***operating permit***. The Department may issue the permit with additional appropriate conditions.

> (c) ***The Department will not issue an* operating *permit unless the source was* constructed *in accordance with the plan approval*** and the conditions of the plan approval.

Plaintiffs argue that this provision required the Former Owners to obtain an operating permit

after the projects at issue.  The fundamental flaw in this argument, however, is that the Former

Owners did apply for, and PADEP did issue, an operating permit for the Plant.[18]  Where the pre-

construction permitting process is never triggered, the plan approval and conditions that

---

[17] Pennsylvania did not promulgate its own PSD regulations.  Instead, the federal regulations at 40 C.F.R. Chapter 52 have been adopted in their entirety and incorporated into the Pennsylvania SIP.  25 Pa. Code § 127.83.

[18] Under Plaintiffs' theory, it appears that PADEP wrongfully issued the Title V permit in violation of § 127.443(c).

JA 038

hypothetically might have been created during that process never materialize, and therefore, are not incorporated into the operating permit.[19]

Plaintiffs also point to 25 Pa. Code § 127.445, which provides that an operating permit may be issued to an existing and operating source that is out of compliance. However, this provision does not create a viable avenue for this post-hoc challenge to projects from the early 1990s because the predicate assumption – that the operating source is out of compliance – has never been proven. To the contrary, the Current Owners have possessed a facially valid operating permit since 2004 and were not on notice that the Former Owners had allegedly failed to obtain a preconstruction PSD permit.

Plaintiffs contend that the Pennsylvania SIP imposed ongoing PSD emissions limitations on the Plant. Three cases have concluded that the relevant state implementation plan contained language stating that the PSD requirements were ongoing. *See Nat'l Parks 6th Cir.*, 480 F.3d at 419 (under Tennessee SIP, obligation to obtain construction permit is ongoing, even post-construction). The Tennessee SIP provides, in relevant part: "In the case where a source or modification was constructed without first obtaining a construction permit, a construction permit may be issued to the source or modification to establish as conditions of the permit, the necessary emissions limits and requirements to assure that these regulatory requirements are met." Tenn. Comp. R. & Regs. § 1200-3-9-.01(1)(e). *See also Sierra Club v. Portland General Electric Co.*, 663 F.Supp.2d 983, 992–94 (D. Or. 2009) (Oregon SIP provides that no source may construct or operate without an ACDP, the Oregon equivalent of a PSD permit); *United States v.*

---

[19] Plaintiffs also point to 35 P.S. § 4009.3, which states: "Each day of continued violation and each violation of any provision of this act, any rule or regulation adopted under this act or any order of the department or any condition or term of any plan approval or permit issued pursuant to this act shall constitute a separate offense and violation." There is no parallel "continuing violation" provision in the federal Clean Air Act. This provision is not implicated because there is no underlying violation of the APCA or PA SIP. To the extent Plaintiffs contend that § 4009.3 provides an independent cause of action, the Court declines to exercise supplemental jurisdiction. The Court has concluded that all federal claims must be dismissed, and this would present a novel and complex issue of state law. 28 U.S.C. § 1367(c).

JA 039

*Duke Energy Corp.*, 278 F.Supp.2d 619, 652 (M.D.N.C. 2003), vacated in part 2010 WL 3023517 (M.D.N.C. 2010) (North Carolina and South Carolina SIPS required integrated construction and operating permits).

Under the Pennsylvania SIP, there is no such integration of construction and operating permits. In that regard, the Pennsylvania SIP is more similar to the state SIPs in which courts have held that no incorporation was intended. *See Nat'l Parks 11th Cir.*, 502 F.3d at 1325 (distinguishing Tennessee SIP and finding no ongoing duty to apply BACT where Alabama SIP "did not provide a way for a party who had undertaken a modification to obtain ... a determination [of BACT] outside the preconstruction permitting process"); *Otter Tail*, 615 F.3d at 1017 (South Dakota SIP imposed no ongoing duty to apply BACT and was distinguishable from Tennessee SIP); *Midwest Generation*, 2011 WL 1003916 at * 4-5 (Illinois SIP does not bar *operation* of plant without *construction* permit) (emphasis in original). In summary, the Court concludes that the claims under the ACPA and Pennsylvania SIP are duplicative of the federal Clean Air Act claims and must be dismissed.

The public nuisance claim is also without merit. Pennsylvania has enacted a "public nuisance" statute, 35 P.S. § 4013, which states:

> A violation of this act or of any rule or regulation promulgated under this act or any order, plan approval or permit issued by the department under this act shall constitute a public nuisance. The department shall have the authority to order any person causing a public nuisance to abate the public nuisance. In addition, the department or any Commonwealth agency which undertakes to abate a public nuisance may recover the expenses of abatement following the process for assessment and collection of a civil penalty contained in section 9.1. Whenever the nuisance is maintained or continued contrary to this act or any rule or regulation promulgated under this act or any order, plan approval or permit, the nuisance may be abatable in the manner provided by this act. Any person who causes the public nuisance shall be liable for the cost of abatement.

**JA 040**

In *American Electric Power Co. v. Connecticut*, 131 S. Ct. 2527 (June 20, 2011), the United States Supreme Court held that the Clean Air Act preempted federal common law nuisance claims as a means to curb emissions from power plants, but did not rule on the availability of a state law nuisance claim. The Supreme Court noted that the issue would turn "on the preemptive effect of the federal Act." *Id.* at 2540.

In *North Carolina, ex rel. Cooper v. Tennessee Valley Authority*, 615 F.3d 291, 303 (4th Cir. 2010), the Court of Appeals for the Fourth Circuit rejected a very similar state law public nuisance claim against power plants. The Court held that public nuisance claims are preempted because they threaten to scuttle the comprehensive regulatory and permitting regime that has developed over several decades. The Court reasoned, in pertinent part:

> A field of state law, here public nuisance law, would be preempted if "a scheme of federal regulation ... [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Here, of course, the role envisioned for the states has been made clear. Where Congress has chosen to grant states an extensive role in the Clean Air Act's regulatory regime through the SIP and permitting process, field and conflict preemption principles caution at a minimum against according states a wholly different role and allowing state nuisance law to contradict joint federal-state rules so meticulously drafted.

*Id.* at 303 (citations omitted).[20] *Accord United States v. Questar Gas Mgt. Co.*, 2010 WL 5279832 (D. Utah 2010).

In this case, it is clear that both the federal Clean Air Act and the Pennsylvania Air Pollution Control Act represent comprehensive statutory and regulatory schemes that establish the standards by which grandfathered power plants must reduce their emissions of air pollutants. Pennsylvania has a statutorily defined role through the SIP and permitting process. Accordingly, common law public nuisance claims are preempted and will be dismissed.

---

[20] The Court noted, but found unpersuasive, the Clean Air Act's savings clause, which states that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." 42 U.S.C. § 7604(e).

36

**JA 041**

D.  Leave to Amend

If a civil rights complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile. *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004); *accord Grayson v. Mayview State Hosp.*, 293 F.3d 103 (3d Cir. 2002). A district court must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend. *Id.*  In non-civil rights cases, however, a plaintiff must seek leave to amend and submit a draft amended complaint.  *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252-53 (3d Cir. 2007).  Plaintiffs have not sought leave to amend in this case and it appears to the Court that such an effort would be futile.

Conclusion

For the reasons set forth above, the motions to dismiss will be **GRANTED**.  The Court appreciates Plaintiffs' frustration that the expectations of the PSD program have not been achieved as to the Homer City plant and that society at large continues to bear the brunt of significant SO2 emissions from that grandfathered facility.  Nevertheless, the Court must adhere to the plain text of the Clean Air Act.   An appropriate Order follows.

McVerry, J.

37

**JA 042**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,                    )
                                             )
            Plaintiff,                        )
                                             )  **2:11-cv-19**
            v.                                )
                                             )  **ORDER OF COURT**
EME HOMER CITY GENERATION L.P.,              )
HOMER CITY OL1 LLC,  HOMER CITY OL2          )
LLC, HOMER CITY OL3 OLC, HOMER CITY          )
OL4 LLC, HOMER CITY OL5 LLC, HOMER           )
CITY OL6 LLC, HOMER CITY OL7, HOMER          )
CITY OL8, NEW YORK STATE ELECTRIC            )
AND GAS CORPORATION and                      )
PENNSYLVANIA ELECTRIC COMPANY,               )
                                             )
            Defendants.                       )
                                             )
_____    )
                                             )
COMMONWEALTH OF PENNSYLVANIA,                )
DEPARTMENT OF ENVIRONMENTAL                   )
PROTECTION and STATE OF NEW YORK,            )
                                             )
            Plaintiffs-Intervenors,           )
            v.                                )
EME HOMER CITY GENERATION L.P., et al.       )
                                             )
            Defendants.                       )
                                             )
_____    )
                                             )
STATE OF NEW JERSEY,                         )
                                             )
            Plaintiff-Intervenor,             )
            v.                                )
EME HOMER CITY GENERATION L.P., et al.       )
                                             )
            Defendants.                       )
                                             )
                                             )

**JA 043**

## ORDER OF COURT

AND NOW, this 12th day of October, 2011, in accordance with the reasoning in the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that EME HOMER CITY GENERATION L.P.'S MOTION TO DISMISS (Doc. No. 85); DEFENDANTS HOMER CITY OWNER-LESSORS' MOTION TO DISMISS (Doc. No. 87); NEW YORK STATE ELECTRIC & GAS CORPORATION'S MOTION TO DISMISS (Doc. No. 88); and PENNSYLVANIA ELECTRIC COMPANY'S MOTION TO DISMISS (Doc. No. 91) are **GRANTED**. The Complaints are **DISMISSED** with prejudice and the clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc:     **Paul E. Skirtich, Esquire**
        Email: paul.skirtich@usdoj.gov
        **Katherine L. Vanderhook, Esquire**
        Email: katherine.vanderhook@usdoj.gov
        **Cara M. Mroczek, Esquire**
        Email: cara.mroczek@usdoj.gov
        **John W. Sither, Esquire**
        Email: John.Sither@usdoj.gov

        **Michael J. Heilman, Esquire**
        Email: mheilman@state.pa.us
        **Michael J. Myers, Esquire**
        Email: michael.myers@ag.ny.gov
        **Susan C. Von Reusner, Esquire**
        Email: susan.vonreusner@ag.ny.gov

JA 044

**Jon C. Martin, Esquire**
Email: jon.martin@dol.lps.state.nj.us
**Jung W. Kim, Esquire**
Email: jung.kim@dol.lps.state.nj.us
**Lisa J. Morelli, Esquire**
Email: lisa.morelli@dol.lps.state.nj.us


**James M. Jones, Esquire**
Email: jmjones@jonesday.com
**Andrew N. Sawula, Esquire**
Email: asawula@schiffhardin.com
**Kevin P. Holewinski, Esquire**
Email: kpholewinski@jonesday.com
**Rebekah B. Kcehowski, Esquire**
Email: rbkcehowski@jonesday.com
**Daniel E. Reidy, Esquire**
Email: dereidy@jonesday.com
**Brian J. Murray, Esquire**
Email: bjmurray@jonesday.com
**Stephen J. Bonebrake, Esquire**
Email: sbonebrake@schiffhardin.com


**Chet Thompson, Esquire**
Email: CThompson@crowell.com
**Jeffrey Poston, Esquire**
Email: JPoston@crowell.com
**Peter T. Stinson, Esquire**
Email: pstinson@dmclaw.com
**W. Alan Torrance , Jr., Esquire**
Email: atorrance@dmclaw.com


**Kevin P. Lucas, Esquire**
Email: klucas@mmlpc.com
**Benjamin S. Lippard, Esquire**
Email: blippard@velaw.com
**George C. Hopkins, Esquire**
Email: ghopkins@velaw.com
**Kevin A. Gaynor, Esquire**
Email: kgaynor@velaw.com
**Stefanie A. Lepore, Esquire**
Email: slepore@velaw.com


**David H. Quigley, Esquire**
Email: dquigley@akingump.com

**Nash E Long , III, Esquire**
Email: nlong@winston.com
**Paul E. Gutermann, Esquire**
Email: pgutermann@akingump.com
**T. Thomas Cottingham , III, Esquire**
Email: tcottingham@winston.com

**JA 046**

## CERTIFICATE OF SERVICE

I, Michael J. Myers, do hereby certify that on November 14, 2012, I served the attached Brief for States of New York and New Jersey, and Commonwewalth of Pennsylvania, Department of Environmental Protection via the CM/ECF System on all counsel as Filing Users under the Court's rules.


   /s/ Michael J. Myers     
        Michael J. Myers